**UNION BOTTLING COMPANY, Appellant,**

v.

**Mickey Gene McDANIEL et al., Appellees.**

**No. 16798.**

Court of Civil Appeals of Texas, Houston (First Dist.).

Jan. 20, 1977.

Lorance, Thompson & Wittig, Rayburn Berry, Houston, for appellant.

Riddle, Murphrey, O'Quinn & Cannon; John M. O'Quinn, Houston, for appellees.

PEDEN, Justice.

The defendant, Union Bottling Company, complains that the trial court's $65,000 award of damages to plaintiff Mickey Gene McDaniel for his personal injuries was excessive. Union Bottling says the jury's damage finding was not supported by sufficient evidence and was against the great weight of the evidence. We affirm.

McDaniel, then 15, was injured on May 18, 1973, in Texas City when his motorcycle collided with a truck owned by Union Bottling. We review his testimony. Before the accident he worked at a grocery store on week-ends and after school. In the summers, he worked there full time. He was earning about $2.50 or $2.60 an hour when he got hurt. This amounted to about $200 a month during school, but he made $400 a month or more in the summer. Before the accident he had no trouble with his middle or lower back. He thinks he was thrown about fifteen feet from his motorcycle by the impact. He was unconscious at first. He was taken to a hospital, where he stayed for about a week and was treated by a specialist in orthopedic surgery, Dr. Pearson. When he left the hospital he couldn't go to school and couldn't work at all until fall, when he was given light duties. A physical therapist taught him some exercises that he still takes.

He had to stay on his back in the hospital. The worst pain was caused by his being unable to move. After he got home the pain got better, then a lot better, then leveled off, and he had good days and bad. It seems a little worse the last eight or ten months. At night when he studies it hurts to sit for a long time; he has to move around, and he finds himself leaning over. When he walks he has to make himself straighten up. He gets spasms, muscle cramps in his back. If he doesn't do his back exercises, his back hurts the next day, as it does when he tries to play games like touch football and basketball.

He has no part-time job now. He is studying accounting at the University of Texas, and that keeps him busy. He knows he is unable to do part-time work that requires lifting, bending and stooping. He has not seen Dr. Pearson since the fall of 1974 because Dr. Pearson couldn't do any-

thing else; surgery wouldn't help, and he just has to learn to live with his condition.

On cross-examination McDaniel said he returned to work in the fall of 1973 and worked straight through high school. He wore the back brace for five months, then discarded it on advice of his doctor. When he got hurt in May, 1973, he stayed in the hospital for a week, then saw Dr. Pearson regularly until October as an out-patient, then was told to come by in a couple of months for a check-up. After that he saw a therapist but has not seen any other doctors for treatment, and has not looked for a doctor in Austin. He still makes almost all A's and hasn't missed time from school. No surgery was performed on his back. He was not in a cast when he was in the hospital, but he was not supposed to move.

On re-direct McDaniel said Dr. Pearson had excused him from physical education class the year after the accident. He hadn't gone to doctors every week or so because they are expensive and neither he nor his mother can afford them.

The plaintiff then introduced certain deposition testimony of Dr. Lynn Pearson. He saw McDaniel at the hospital on May 18, 1973, the day of his accident. McDaniel had a fracture of the first and second lumbar vertebrae. Dr. Pearson made a final evaluation on October 1, 1973. The usual healing period of these fractures is three months, and McDaniel's had healed on schedule. He was taken out of his brace on August 23. "Radiographically he still had his wedged vertebra, which was holding its height satisfactorily on physical examination." Sensations and reflexes were within normal limits. The doctor found no limitation of activities. He found leg length, calf, and thigh circumference measurements to be equal. He thought McDaniel would "pretty well be able to physically and actively do what he so desired to do."

Dr. Pearson, referring to records of an office visit on May 30, 1973, said x-rays revealed the compression fragments were holding their own. McDaniel had gone without his brace around the house, and the doctor explained to him that if he receives a

second injury, such as by tripping, his injury could be extended into paralysis. "Neurological is intact. Reflexes are brisk and equal bilaterally, as is the strength in the quadriceps and dorsiflexors of his feet."

The purpose of the back brace is to limit the range of motion at the fracture site. Healing of a fracture fragment by calcification does not necessarily mean that the total injury has healed or that there will not be any symptoms of physical impairment. He did not find "considerable soft tissue residual or other physical impairment still present." Even though the fracture heals, one can still have a bothersome residual. He would expect that within two years after the accident McDaniel had achieved all of the physical improvement he will attain. A traumatic injury causing a compression fracture like McDaniel had can cause soft tissue injury, including formation of scar tissue.

Dr. Neal Longley, a specialist in radiology, testified that he had taken x-rays of the plaintiff's lumbar spine on the day before the trial. He introduced them. Lumbar vertebrae L–1 and L–2 appear to be normal as does an intervertebral disc space at that level; it is wider in front than in back, but the others are not. The back of L–1 is 4 centimeters high, while its front is only 2.2 centimeters high. This means its front has been smashed down to half of its height in back. The picture of L–2 is slightly denser than the others, indicating that it had been fractured. The disc space is widened because the body, in attempting to stay erect, is using the muscles to hold the vertebrae above the narrowed one in a straight column. This causes the plaintiff to constantly make an unusual effort to stay erect so as to avoid more kyphosis. The doctor thinks this effort of the muscles to keep the back erect has caused the widening of the disc space. It is important to keep the back straight and avoid abnormal weight bearing, which causes more wear and tear, may cause or accentuate painful muscle spasms, and tends to lead to the development of arthritic changes as the body's protection against wear and tear.

In response to a long hypothetical question that encompassed evidence concerning the accident and its effect on the plaintiff, the doctor said he believed the abnormalities he saw in the plaintiff's x-rays were caused by his accident of May 18, 1973. He said he would expect the plaintiff to develop either further compression or degenerative arthritic changes or both. His condition will worsen. He probably had tears of adjacent muscles and stretching of ligaments and possibly of the spinal cord.

His physical activities in recreation and employment will be adversely affected for the rest of his life.

"Whereas he is able to by muscular control keep the front of the vertebra almost in line with the other vertebrae by widening the interspace between, sooner or later the muscles are going to lose their strength and there will be a gradual wedging down of the whole spine at the point where the vertebrae is wedged, therefore the weight bearing will instead of being in the center of the spine will be pushed forward and the front edges of the vertebrae will carry more weight and will tend to give more and more wedging so as the muscles loosen or become less strong then there should be a forward displacement of the weight bearing line and further curvature of his back."

In the doctor's opinion there is going to be a "significantly recognizable deformity" in the plaintiff's back in the future.

On cross-examination, Dr. Longley said the fractures have healed. Some of the abnormality he saw was just as if a little extra calcium was found around a break in an arm bone. The doctor gave these answers when asked these questions:

"Q Suppose the physician who treated this young man assuming he was referred to the young man by his family doctor was asked this question and gave this answer: 'In your examination of this patient of October 1st, 1973, this would be approximately five months after the accident, did you find any evidence of physical difficulties arising from compression at the L–1 level, and did you in fact find any compression at this level' and suppose with me Doctor that the treating physician answered as follows: 'Radiographically he still had his wedged vertebra which was holding its height satisfactorily on physical examination. His examination was within normal limits as far as sensation and reflexes went. And I did not find any limitation of activities. His leg lengths were equal and his calf and thigh circumferential measurement were equal.' Assuming that statement were given by the boy's treating physician on October 1st, '73, would there be anything that you found in your x-ray that would contradict that?

"A No.

"Q All right. Assume also, Doctor, that the same physician, a treating physician who treated the young man in the hospital, took care of him in the hospital and was referred by the young man's family physician was asked this question and gave this answer: 'You many times see fractures where later the fracture fragments healed and yet there is considerable soft tissue residual or other physical impairments still present. That is true but in this case I did not find that.' So assuming that his treating physician found no soft tissue residual in this patient some three to five months after the accident, is there anything in your diagnosis in these x-rays to contradict that?

"A No."

He knows nothing about the plaintiff's soft tissue or scar tissue, since x-rays do not show them. His treating physician would "supposedly" be far better qualified to know about that. Nothing in the x-rays contradicts the treating physician's finding that the compression fractures of L–1 and L–2 were completely healed within three months after the accident. Dr. Longley

said his evaluation does not contradict a statement made by the treating doctor one month after the accident that McDaniel was wearing his back brace, had no real complaint about his back, is only slightly tender to palpation, his x-rays showed holding of the fracture in position, "neurological is intact" in lower extremities, and said that he can walk on his toes and heels. Dr. Longley did not examine the plaintiff, only his x-rays. A wedge-shaped vertebra is not necessarily unstable and may hold itself satisfactorily.

On re-direct examination Dr. Longley testified that the healing of the plaintiff's fractures does not mean that he has no physical impairment. Nor does the treating doctor's report one month after the accident mean that the plaintiff does not have an injury that was significantly recognizable on x-ray or that he was not going to have permanent impairment such as kyphosis or a wedge-shaped vertebra after it healed. It is highly likely that the plaintiff will develop arthritic changes at the level of the fractures. At this time Dr. Longley finds no change in the support given by the plaintiff's back muscles.

The damage finding was made in response to this special issue:

"What amount of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Mickey McDaniel for the injuries directly resulting from the collision in question? You shall take into consideration such of the following elements of legal damages as you find established by a preponderance of the evidence, and none other:

"1) Physical pain and mental anguish which he has suffered from May 18, 1973 until now.

"2) Loss of capacity to work, perform services, and earn money which he has suffered from May 18, 1973 until now.

"3) Physical impairment which he has suffered from May 18, 1973 until now.

"3) Physical impairment which he has suffered from May 18, 1973 until now.

"4) Physical pain and mental anguish which, in reasonable probability, he will suffer in the future.

"5) Loss of capacity to work, perform services and earn money, which in reasonable probability, he will suffer in the future.

"6) Physical impairment which, in reasonable probability, he will suffer in the future?

"Answer by stating an amount, if any, in dollars and cents."

██ Since the plaintiff was only 15 when injured, he had a long life expectancy. We have noticed all the evidence touching on the question of excessiveness of the award. We are not to merely substitute our judgment for that of the jury, and we find no indication of bias or prejudice in the entire record. The jury is entitled to consider the decrease in the value of the dollar. Personal injury damages are not capable of measurement by any certain standard, so the jury has wide discretion in fixing the amount of the award. *Hammond v. Stricklen*, 498 S.W.2d 356 (Tex.Civ.App.1973, writ ref. n. r. e.).

We have carefully examined the entire record and have reviewed the awards in numerous other cases. We conclude that the award in this case was not excessive.

The appellant's other point of error is that the trial court erred in overruling its motion for new trial because the jury's answer to Special Issue 2b was not supported by sufficient evidence and was against the great weight of the evidence. Issue 2b asked whether the jury found from a preponderance of the evidence that on the occasion in question the plaintiff was negligent in following too closely. The jury's negative finding means that it decided the defendant had not sustained its burden of proof on the issue.

██ We overrule this point. The plaintiff and the defendant's truck were both proceeding north on the east half of 21st

Street before the accident. Each half of the street was wide enough to be divided into two lanes. The plaintiff and the only disinterested eyewitness both testified that the defendant's truck was near the center stripe while the plaintiff was on the outer side of the northbound portion. The jury was entitled to decide that when the plaintiff was about to overtake the truck he was behind it in the sense that he had not yet caught up with it but that he was east as well as south of it. Had lanes been marked on the street at that time the two vehicles would have been in different lanes. Under these circumstances the jury could find that the plaintiff was not following too closely.

Affirmed.