MISSOURI PACIFIC RAILROAD COMPANY d/b/a Union Pacific Railroad Company, Appellant,

v.

William J. ROBERSON, Appellee.

No. 09–99–082–CV.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 17, 2000.

Decided May 11, 2000.

Publication Ordered Sept. 7, 2000.

Cathleen C. Herasimchuk, Rusty Hardin & Associates, P.C., Houston, Alice Brown, Union Pacific Railroad Company, Houston, for appellant.

Daniel J. Cohen, Baure & Baebler, St. Louis, Gilbert T. Adams, III, Beaumont, for appellee.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

William Roberson, appellee, brought the underlying lawsuit against his employer,

Union Pacific Railroad Company, appellant, pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C.A. §§ 51–60 (West 1986). Following trial by jury, the trial court entered judgment upon the verdict which awarded Mr. Roberson over $1.5 million for a knee injury sustained in performing his duties as a carman. The railroad's post-trial motion for judgment notwithstanding the verdict (JNOV), and motion for new trial were both denied by the trial court. The railroad brings three appellate issues to us for consideration, *viz:*

1) Did the trial court commit reversible error in refusing to submit properly worded jury instructions on the plaintiff's contributory negligence?

2) Did the trial court err in denying appellant's motion for JNOV because there was no evidence of appellant's negligence?

3) Did the trial court err in denying appellant's motion for remittitur because there was no evidence or insufficient evidence to support the amount of the jury's award of damages?

■ We initially consider the railroad's second appellate issue. A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227–28 (Tex.1990). In reviewing the denial of a motion for JNOV, we review the evidence in the light most favorable to the jury findings, considering only the evidence and inferences that support them, and disregarding all evidence and inferences to the contrary. *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of evidence to support the findings, the motion for JNOV was properly denied. *Mancorp,* 802 S.W.2d at 228. The railroad's appellate burden is exacerbated by the fact that in an FELA case, a plaintiff is only required to prove that the railroad's negligence played any part, even the slightest, in producing the injury or death

for which damages are sought. *See Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957); *Mitchell v. Missouri–Kansas–Texas R. Co.,* 786 S.W.2d 659, 661 (Tex.1990). Furthermore, 45 U.S.C.A. § 54 provides the following, in pertinent part:

> In any action brought against any common carrier ... to recover damages for injuries to ... any of its employees, such employees shall not be held to have assumed the risks of his employment in any case where such injury ... resulted in whole or in part from the negligence of any of the officers, agents or employees of such carrier.

The jury was so instructed.

■ The testimony of Mr. Roberson reflects that on October 10, 1991, while working as a carman inspecting railroad cars for his employer, Missouri Pacific/Union Pacific, he sustained an injury to his left knee when his foot slipped on some large, loose ballast that was abundant in the area where he was working. Said area was known as the "classification tracks." Mr. Roberson testified that he sustained a similar, but less severe, injury in 1987, on his right knee while walking on large ballast during a car inspection. Mr. Roberson stated that he had complained to his employer prior to his 1987, injury of the dangers posed by walking on large ballast, but the railroad did nothing to alleviate the problem. Mr. Roberson then described an incident that took place at the railroad yard prior to October, 1991, involving the railroad's master mechanic, a Mr. Eason, and another carman, Joe Matejek. The incident was described as follows:

A. [Roberson] Yeah, Mr. Eason was called out in the yard one night because one car man was objecting to going out there.

Q. [Plaintiff's trial counsel] And who was that?

A. That was Joe Matejek. He said he wasn't going out there, it's too dangerous. So they called Mr. Eason, the

Master Mechanic, and Matejek took Mr. Eason out there to show him what he's talking about.

Q. And what was the nature of the complaint that you heard being made to Mr. Eason?

A. He was complaining about the debris, the big rocks, and the closeness of the tracks in that area, in the class tracks.

Q. And they went out to look at it together?

A. Right.

Q. Did they return to where you were?

A. Yes.

Q. Did you at this time hear Mr. Eason respond orally, verbally, to what Mr. Matejek had complained about?

A. Right. I did hear it.

Q. And what did he say?

A. He said it was too dangerous. He said it's too dangerous to work out there.

Q. What was done that evening with the train that Mr. Matejek had been ordered to inspect in the classification tracks?

A. He took the train out of the classification tracks and put it in another track.

Q. The next evening that you would have worked, the next shift that you would have worked following that incident with Mr. Matejek and Mr. Eason, were any trains spotted in the class tracks?

A. Yes.

Q. Did that incident between Mr. Matejek and Mr. Eason change the practice and policy of the railroad of spotting trains in the class tracks and having carman men [sic] go inspect in there?

A. Well, they decided when they'd spot a train over there that they would lock the two adjacent tracks to prevent any movement on the side of you when you're working in the classification tracks.

Q. Did they do anything to alleviate or remedy Mr. Matejek's complaint about the weeds the debris or the large rock?

A. No.

. . . .

Q. Were debris problems corrected?

A. No.

Q. Was the large rock removed?

A. No.

Q. Was the rock, the large rock that was there, smoothed over and packed down so it wouldn't tend to shift?

A. No.

Other Missouri Pacific/Union Pacific employees echoed the testimony of Mr. Roberson concerning the unsafe conditions for persons walking the classification tracks. Joe Varela, also a carman, stated that the ballast surrounding the classification tracks is "large sized," and that large size ballast "makes it difficult for walking." When asked why large size ballast makes walking difficult, Varela replied, "Because it shifts underfoot as you're walking along. It has a tendency to shift on you from one side to another, and it's just sometimes— it's just liable to go in any direction." Another carman, Phillip Lundry, agreed that, regarding the type of large ballast found at the classification tracks, a person cannot tell "by eyesight" which rock will not support a person's weight. He also agreed that large ballast can "shift out from under you even when you're being extra careful." Testimony was also introduced that the supervisor of railroad's "Maintenance of Way" department, Lloyd Smith, made the comment during one of the safety meetings held for employees that large size ballast "had no business being in a yard like this because of all the foot traffic through the yard."

There was testimony from the railroad's expert regarding ballast conditions at the location where Mr. Roberson was injured. Mr. Satis Malhotra, a civil engineer, testified that the purpose of ballast is to give better distribution of load to the railroad tracks and for proper drainage. However,

Mr. Roberson's trial counsel introduced into evidence a portion from a publication of the American Railway Engineering Association dealing with "Ballast Gradations," which read:

> Rail yards and some industrial track gradations are generally graded from 1 inch to 3/8ths inch ... to provide improved walkway and safety conditions along the track. The finer gradations for yard applications do not restrict track drainage as the construction practices for yard facilities provide quick runoff of ground water through the means of undertrack and yard drainage systems.

■■■ The FELA requires an employer to provide its employees with a reasonably safe place to work, and this includes a duty to maintain and inspect work areas. *Grano v. Long Island R. Co.*, 818 F.Supp. 613, 618 (S.D.N.Y.1993). This duty is an ongoing one and its scope has been described in the following manner: "An employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Gallose v. Long Island R.R.*, 878 F.2d 80, 84–85 (2d Cir. 1989) (citing *DeChico v. Metro–North Commuter R.R.*, 758 F.2d 856, 862 (2d Cir.1985)). While there is a considerably more relaxed standard of proof for determining negligence in FELA cases, plaintiffs are still required to prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation. *Grano*, 818 F.Supp. at 618. In the instant case, Mr. Roberson has shown that the railroad had actual knowledge of the unsafe conditions for carmen or anyone walking along the classification tracks where the large ballast was located. It was clearly foreseeable that employees required to inspect cars spotted on the classification tracks would injure themselves as they had to walk over the large ballast to conduct the inspections. The railroad's contention that large ballast was absolute-ly necessary in order for proper drainage of water to take place was sufficiently rebutted for the jury to have disregarded it as somehow making the railroad's acts or omissions regarding the large ballast reasonable.

Under the proper appellate standards of review as set out above for the denial of a JNOV as well as for FELA cases, we find much more than a scintilla of evidence to support the jury's finding that the railroad was negligent and that said negligence played a part in producing Mr. Roberson's left knee injury. As such, the trial court did not err in denying the railroad's motion for JNOV. Point of error two is overruled.

■■■ In considering the railroad's first issue, we note that in FELA cases, the burden of proving contributory negligence is on the railroad. *Wilson v. Burlington Northern, Inc.*, 670 F.2d 780 (8th Cir.1982). After examining the record evidence closely we find no evidence that raised the possibility that Mr. Roberson was somehow at fault in sustaining his knee injury. The testimony, as set out above from several sources, was that large ballast was unsafe to walk on because you could not tell just from looking at it whether or not it would support a person's weight. Therefore, the railroad's basic contention that Mr. Roberson simply failed to "watch where he was walking" is really of no consequence. There was no evidence that Mr. Roberson was not conscious of the "underfoot conditions" at the time of the injury. Indeed, there was abundant evidence that carmen were aware, and appropriately respectful, of the unstable nature apparently inherent in the piling of large ballast located along the classification tracks.

As we appreciate the gist of the railroad's position as argued in its brief the evidence of Mr. Roberson's contributory negligence came from the fact that he was a carman with 24 years experience walking the ballast along the classification tracks so because he sustained the knee injury by

slipping on large ballast he must not have been walking cautiously. The railroad cites us to *Martinez v. Union Pacific R. Co.*, 82 F.3d 223, 228–29 (8th Cir.1996), for the proposition that "the law requires [plaintiff] to do two things at once," *i.e.,* "to be alert and attentive when performing his duties and to exercise reasonable care for his own safety." However, as noted in *Martinez,* Martinez admitted that he fell when he *"misjudged"* his position on the ramp. Because, as we have already noted, visual observance of the condition of large ballast is virtually useless as a gauge of its stability, Mr. Roberson's visual awareness of the ballast condition is a non-issue regarding his contributory negligence. We have no evidence even inferring that he was walking on the large ballast in a manner inconsistent with the caution necessary to do his job safely and without risk of injury. The railroad makes the statements in its brief that the record contains *evidence* that Mr. Roberson "could have walked more cautiously," and "failed to take ordinary precautions by walking more slowly." We are not provided, however, with any citation to the record in order to locate this "evidence." If these observations are to be inferred, there must be some probative evidence upon which to base them. We find none. The trial court, therefore, did not err in refusing to submit the railroad's request for an instruction on contributory negligence to the jury. Point of error one is overruled.

In its final challenge to the judgment, the railroad contends that the jury's damage award was not supported by the evidence. We disagree and overrule point of error three.

■ The amount of damages awarded is uniquely within the jury's discretion. *Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 581 (Tex.App.—Houston [1st Dist.] 1992, no writ). Personal injury damages are unliquidated and are not capable of certain measurement; the jury has broad discretion in assessing the amount of damages in a personal injury

case. *See Transit Management Co. of Laredo v. Sanchez,* 886 S.W.2d 823, 826 (Tex.App.—San Antonio 1994, no writ). A jury may exercise considerable discretion and generosity in awarding damages for personal injuries. *Dougherty v. Gifford,* 826 S.W.2d 668, 682 (Tex.App.—Texarkana 1992, no writ).

■ The standard of review for an excessive damages complaint in FELA cases is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998). In *Ellis,* the Supreme Court of Texas described the factual sufficiency analysis as follows:

> When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result.

*Id.* at 406–07 (citations omitted).

■ It is presumed that the jury considered all of the available evidence. *Carr v. Galvan,* 650 S.W.2d 864, 869 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). The mere fact that an award is large is no indication of passion, prejudice or improper motive on the part of the jury, *Texas Const. Service Co. of Austin v. Allen,* 635 S.W.2d 810, 812 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), and a court is not to substitute its judgment for that of the jury as to the amount of damages to be awarded for personal injuries. *Union Bottling Co. v. McDaniel,* 546 S.W.2d 876, 880 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). Rather, it is only when the award of damages is "flagrantly outrageous, extravagant, and so excessive as to

shock the judicial conscience," that it may be disturbed. *American Bank v. Waco Airmotive,* 818 S.W.2d 163, 175 (Tex. App.—Waco 1991, writ denied).

■ The jury awarded $45,000 for past lost earnings. Mr. Roberson testified that his wage loss during his period of post-operative recovery in 1992 was approximately $15,000, and that in the ensuing six (6) years he lost overtime at a rate of one shift per week, yielding a cumulative overtime loss in the approximate amount of $60,000, for a total of $75,000 in past lost earnings. It was for the jury to determine Mr. Roberson's award for this element of damage, and it cannot be said that the jury's award of $45,000 exceeded the reasonable range of damages supported by the evidence.

■ The jury awarded $600,000 for future loss of earning capacity. Mr. Roberson earned approximately $50,000 in 1997, and this income did not include approximately $10,000 in overtime which Mr. Roberson had declined because of his injury. From this evidence, the jury was free to find that Mr. Roberson's earning capacity in 1997 was at least $60,000, not including fringe benefits of employment. The evidence also indicated that Mr. Roberson had received salary increases since his injury, and it was within the province of the jury to include damages to account for Mr. Roberson's likely salary increases in the future. The jury heard evidence that Mr. Roberson would have a total knee replacement at some point in the future, that such surgery might even become necessary within the next twelve months, and that, following this surgery, Mr. Roberson would be unable to perform the duties of his former occupation. Thus, the jury was entitled to conclude that Mr. Roberson's earning capacity would cease almost immediately, at age 55. And, contrary to the railroad's suggestion, the jury was not required to calculate Mr. Roberson future loss of earning capacity only to age 65. Although Mr. Roberson testified that barring physical disability he thought he probably would retire at that age, the jury was free to conclude that Mr. Roberson would have continued working for the railroad beyond that age, if not for his injury. *A.T. & S.F. Ry. Co. v. O'Merry,* 727 S.W.2d 596, 600 (Tex.App.—Houston [1st Dist.] 1987, no writ)(It is assumed that but for injuries suffered, injured party would have continued to work and receive payment until retirement, disability or death); *Roberts v. Tatum,* 575 S.W.2d 138, 143 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.)(noting that jury was empowered to find that the plaintiff would continue working beyond age 65 despite his testimony suggesting otherwise).

■ The jury awarded $85,000 for past pain and mental anguish, and $250,000 for future pain and mental anguish. It is peculiarly within the province of the jury to determine the dollar amount of a plaintiff's pain and suffering. *Lege v. Jones,* 919 S.W.2d 870, 877 (Tex.App.— Houston [14th Dist.] 1996, no writ). There are no objective guidelines by which a court may measure the money equivalent of mental pain, and much discretion must be allowed to the jury in fixing this amount. *Green v. Meadows,* 527 S.W.2d 496, 499 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). In the case at bar, the jury's awards for past and future pain and mental anguish are supported in the evidentiary record.

Mr. Roberson suffered a torn medial meniscus of the left knee on October 10, 1991, and he submitted for surgical repair of that injury on December 13, 1991. The injury and corrective surgery contributed to post-traumatic degeneration of the medial compartment of the knee, and he is now a candidate for and may require in the future both arthroscopic and total-knee replacement surgeries. Mr. Roberson testified to his complaints of pain from the time of injury through to the present, his co-employees corroborated this testimony with their own eyewitness accounts, and Drs. Bocell and Butler agreed that such

symptoms are consistent with the injury and post-traumatic progression. In fact, Dr. Butler testified in great detail as to the pain that Mr. Roberson will likely experience in the period of time immediately preceding his total knee replacement. Under these circumstances, the jury's award of $85,000 for six years of progressively worsening pain, and $250,000 for the severe symptoms which are unavoidable in the future, is reasonable.

■ The jury awarded Mr. Roberson $150,000 for past physical impairment and $375,000 for future impairment. Regarding past impairment covering approximately a six year period of time, the jury heard evidence that Mr. Roberson's knee "pops" and "cracks"; that the knee swells with activity; that Mr. Roberson has difficulty standing for long periods of time; that Mr. Roberson has difficulty ascending and descending stairs; and that he cannot kneel down. This is evidence of impairment, both past and present, which the jury was entitled to consider in reaching their award of $150,000. To remit this award, as suggested by appellant, would require this Court to go behind the jury's consideration, determination, and weighing of the evidence. This we cannot do and find that the evidence of past physical impairment is sufficient to support the jury's award.

■ The award of $375,000 for future physical impairment is somewhat different in that for the most part such damages are based in and upon conjecture as to how Mr. Roberson's present and past impairment may play out in the future. Medical evidence supports that at some point in time, Mr. Roberson will need a knee replacement. The medical evidence is vague as to when a knee replacement will be required, and wholly wanton as to a prognosis following such knee replacement. In *White v. Sullins,* 917 S.W.2d 158, 162 (Tex. App.—Beaumont 1996, writ denied), we discussed the speculative nature of certain types of physical damage awards as follows:

In deciding Sullian's damages the jury was instructed it could consider several elements including some Sullins would incur in the future: physical pain, mental anguish, physical impairment, and disfigurement. Such damages are necessarily speculative and particularly within the jury's province to resolve. *Pipgras v. Hart,* 832 S.W.2d 360, 365–66 (Tex.App.—Fort Worth 1992, writ denied), *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 268 (Tex.App.—Beaumont 1987, no writ). The mere fact the jury's award is large does not indicate the jury considered passion, prejudice, sympathy, or other circumstances not in evidence. *International Harvester Co. v. Zavala,* 623 S.W.2d 699, 708 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

*See also Dico Tire, Inc. v. Cisneros,* 953 S.W.2d 776, 791–92 (Tex.App.—Corpus Christi 1997, pet. denied). ("When the elements of damages considered by the jury include the more amorphous, discretionary damages, such as mental anguish, pain and suffering, physical impairment, and disfigurement, any amount awarded above the more definitive past medical expenses and lost wages will be left to the discretion of the jury.") The jury must take Mr. Roberson's condition at time of trial, consider the impairment evidence retrospectively to date of injury, then prospectively extrapolate an award which the jury believes will reasonably and fairly compensate Mr. Roberson for his impairment in the future.

According to the medical testimony, it is inevitable that Mr. Roberson will have to undergo knee replacement. There is no evidence of when this will occur nor the expected success of such surgery. The jury was left to take Mr. Roberson as he was at trial, then reasonably and fairly speculate as to his future impairment. *See Austin v. Shampine,* 948 S.W.2d 900, 916 (Tex.App.—Texarkana 1997, pet. withdrawn). We hold that the evidence was

sufficient to allow such speculation and to justify their award of $375,000.

The jury awarded Mr. Roberson $85,000 for future medical care. An award of future medical expenses is primarily a matter for the jury, and no precise evidence is required. *Beverly Enterprises v. Leath,* 829 S.W.2d 382, 386 (Tex. App.—Waco 1992, no writ). Such an award may be based on the nature of the injuries, the medical care rendered in the past, and the condition of the injured party at the time of trial. *Id.; see also Southwest Texas Coors, Inc. v. Morales,* 948 S.W.2d 948, 952 (Tex.App.—San Antonio 1997, no pet.). A jury may choose to be guided by expert testimony as to future medical damages, but is not bound by it. *Novosad v. Mid–Century Ins. Co.,* 881 S.W.2d 546, 550 (Tex.App.—San Antonio 1994, no writ). The jury is free to disbelieve an expert medical witness' opinion testimony concerning need for and cost of future medical care. *Id.; see also Morales,* 948 S.W.2d at 952 (Expert testimony on damages is only evidentiary and not binding upon trier of fact).

In the case at bar, Dr. Bocell testified that the cost associated with a total knee replacement surgery would be approximately $20,000. However, neither Dr. Bocell nor any other witness testified regarding the cost of the separate arthroscopic procedure which Mr. Roberson may require, or the cost associated with medications and physical therapy following either procedure. The above decisions stand for the proposition that Mr. Roberson would have made a submissible case on the issue of future medical care even in the absence of Dr. Bocell's dollar-specific testimony.

Finding no sustainable error the judgment of the trial court is affirmed.

AFFIRMED.