

# NUMBER 13-11-00186-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

ALLSEAS USA, INC.,                 **Appellant,**

**v.**

PS FABRICATORS, L.L.C. F/K/A PS
FABRICATORS & CONSTRUCTORS, L.L.C.,       **Appellee.**

---

### On appeal from the 269th District Court
### of Harris County, Texas.

---

# MEMORANDUM OPINION[1]

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Rodriguez

---

[1] This case is before the Court on transfer from the Fourteenth Court of Appeals in Houston pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

In this breach of contract case involving the construction and testing of underwater oil and gas pipeline equipment, appellant Allseas USA, Inc. challenges the jury's verdict in favor of appellee PS Fabricators, L.L.C. f/k/a PS Fabricators & Constructors, L.L.C. (PSF). By three issues, Allseas argues that: (1) the evidence was factually insufficient to support the jury's apparent finding that Allseas did not pay approximately $190,000 in factory acceptance testing charges to PSF; (2) the evidence was factually insufficient to support the total amount of damages awarded in light of PSF's failure to provide adequate documentation of its charges under the contract; and (3) the trial court abused its discretion in denying Allseas's motion for new trial based on newly discovered evidence. In the event the Court sustains its factual sufficiency challenges, Allseas requests that we suggest remittitur of the jury's damages and attorney's fees awards and, in the alternative, remand for a new trial. We affirm.

## I. Factual Background

Allseas is in the business of constructing underwater oil and gas pipelines. PSF is a contractor that fabricates the structures that are used in the construction of underwater pipelines. In August 2006, Allseas contracted with PSF to build a series of structures that would be used in Allseas's construction of an underwater pipeline in the Gulf of Mexico for Discovery Producer Services, LLC.[2] Allseas and PSF's contractual relationship was governed by a Master Services Agreement (MSA).

At the end of September 2006, a work order was issued, pursuant to the MSA, for the fabrication of two of the structures—in-line sleds, or ILSs, that were to be installed at

---

[2] Discovery Producer Services, LLC was not a party to the underlying lawsuit or this appeal.

designated points along the pipeline to allow future pipelines to connect to the existing pipeline through a prefabricated valve. At the end of October 2006, the parties executed a variation order, pursuant to the MSA, that governed the fabrication of a third structure—a pipeline end sled, or PLES, which would be installed to connect the pipeline to Discovery's floating production facility.

There were three phases in the fabrication projects. First, PSF fabricated the structures. Second, PSF would run the structures through factory acceptance testing—or FAT—to ensure that the structures performed as designed. Third, PSF would run the structures through system integration testing—or SIT—in which PSF woud attempt to duplicate the seafloor conditions on which the structures would be resting and ensure that the structures, as fabricated, would be able to be installed and function under those conditions.

Under the work and variation orders, which, pursuant to the MSA, set the price schedules, the fabrication work for each structure was to be billed at a set price, and both FAT and SIT were to be billed at cost plus five percent (also known as cost-plus charges). Under the MSA, any invoice containing charges based on costs associated with a rate sheet must be submitted with "appropriate documentation." FAT and SIT were charges based on rate sheet costs, and therefore, the MSA required that any invoice including FAT and SIT costs be supported by appropriate documentation.

PSF began working on the contract in September 2006, with fabrication and then testing continuing through February 2007. Throughout this time period, PSF sent Allseas periodic invoices for the work performed. Allseas paid the invoices through

3

March 2007 but, at that point, began having questions about the testing charges.[3]  PSF revised the questioned invoices and provided Allseas documentation supporting the FAT and SIT cost-plus charges, but ultimately, Allseas was unsatisfied with the documentation PSF provided and refused to make further payments on the invoices.

The final total amount of SIT charges invoiced by PSF was $1,655,053.81; the final total amount of FAT charges invoiced by PSF was $210,924.71.  It is undisputed that Allseas paid $768,795.62 in SIT charges; it remains disputed by the parties whether Allseas made any payments for the FAT charges.

## II.  Procedural Background

In May 2008, PSF filed suit against Allseas, alleging that Allseas breached the MSA and associated work orders by failing to pay the invoiced SIT and FAT charges in full.[4]  PSF prayed for $886,258.19 in damages for the unpaid SIT charges and $210,924.71 in damages for the unpaid FAT charges.  Allseas answered, asserting as an affirmative defense that PSF's invoices did not comply with the parties' agreement as they were not accompanied by the required documentation.  Allseas also asserted three counterclaims:  breach of contract, alleging that PSF's failure to provide adequate documentation to support its invoices resulted in overpayment by Allseas; fraud, alleging that PSF charged Allseas for costs PSF knew were false; and a request for various declarations regarding the terms of the contract between the parties.

PSF's breach of contract claim and Allseas's breach of contract and fraud

---

[3] The fixed costs for fabrication of the ILSs and PLES, and Allseas's payment of those fixed costs, are not at issue in this case.

[4] PSF also alleged claims under the Theft Liability Act and for quantum meruit and unjust enrichment.

4

counterclaims were tried to a jury August 2-6, 2010.   After the close of evidence, the jury was asked, in relevant part:   (1) whether Allseas failed to comply with its agreement with PSF, to which the jury answered "yes"; (2) whether Allseas's failure to comply was excused, to which the jury answered "no"; (3) what sum of money would compensate PSF for Allseas's failure to comply, to which the jury answered $316,509 for "SIT-related services" and $88,000 for "FAT-related services"; (4) whether PSF failed to comply with its agreement with Allseas, to which the jury answered "no"; (5) whether PSF committed fraud against Allseas, to which the jury answered "no"; and (6) what a reasonable fee for PSF's attorneys would be, to which the jury answered $254,305.   The trial court entered judgment on the jury's verdict, awarding PSF a total of $404,509 in damages, $254,305 in attorney's fees, and prejudgment interest.   Allseas filed a motion for new trial, which was denied by the trial court.   This appeal followed.

## III.   Evidence of Damages

By two issues, Allseas argues that the evidence was factually insufficient to support the FAT and SIT damages awarded by the jury.[5]   Allseas urges us to suggest remittitur of the amounts awarded by the jury or, in the alternative, remand for a new trial. *See* TEX. R. APP. P. 46.3.

## A.   Factual Sufficiency and Remittitur of Damages

Where there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award, the court of appeals may suggest a remittitur.   *Bechtel Corp. v. CITGO Products Pipeline Co.*, 271 S.W.3d 898,

---

[5] Allseas does not challenge the jury's liability findings.

922 (Tex. App.—Austin 2008, no pet.); *see* TEX. R. APP. P. 46.3.   The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded for a new trial.   *Bechtel Corp.*, 271 S.W.3d at 922.

"Factual sufficiency is the sole remittitur standard for actual damages."   *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).   In determining whether damages are excessive, we use the same test as for any factual insufficiency question.   *Id.*   Under a factual sufficiency review, we "examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust."   *Id.*   Generally, the amount of damages awarded is a matter uniquely within the jury's discretion.   *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Mo. Pac. R.R. Co. v. Roberson*, 25 S.W.3d 251, 257 (Tex. App.—Beaumont 2000, no pet.). "[I]t is only when [a jury's] award of damages is 'flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience,' that it may be disturbed."   *Mo. Pac. R.R. Co.*, 25 S.W.3d at 257-58 (quoting *Am. Bank of Waco v. Waco Airmotive, Inc.*, 818 S.W.2d 163, 175 (Tex. App.—Waco 1991, writ denied)).

## B.  Supporting Documentation for SIT and FAT Costs

We first address Allseas's second issue, in which it argues that PSF failed to meet its burden under the contract to provide supporting documentation for its invoiced SIT and FAT costs.   Allseas argues that its expert evidence went largely uncontested by PSF and that the jury's SIT and FAT damages awards, based on PSF's inadequate documentation, were therefore so against the great weight and preponderance of the evidence as to be

6

manifestly unjust.

### 1. The Evidence

At trial, PSF offered the testimony of three witnesses with regard to the costs and billing involved with the Allseas project. Steven Collins testified that he worked in accounting and bookkeeping for PSF; he created the payroll, billing, and invoices. Collins described PSF's time clock system, stating that employees were to punch in and out when they began and ended work on a particular project. This allowed PSF to keep track of labor costs on each of the several projects they were working on at the same time.

Gloria Bray, who was employed by PSF as vice-president of operations, sales, and marketing, testified that she oversaw "the administration of basically everything that went on in the company, project managers, more or less reported to me as well as the administrative side, the purchasing side, the financial side, the sales side and then up to fabrication." Bray testified that at some point during the Allseas project, she began keeping spreadsheets to document the labor and equipment costs PSF was incurring. She began keeping the spreadsheets because the "time clock plus system" that employees were supposed to use "did not go over so well" and was not consistently and correctly used by employees, so she felt she needed an additional method to document PSF's costs on the project. Bray testified that the data she entered in her spreadsheets was based on time sheets generated from the time clock system, interviews with employees in the yard about their hours and equipment use, and daily job reports generated by supervisors. Bray testified that when Allseas began to dispute the invoiced SIT and FAT costs, she sent Allseas her spreadsheets as documentation for the costs.

Finally, Bray testified to the amounts PSF believed it was still owed by Allseas for SIT and FAT costs. Bray testified that the total amount of SIT costs incurred was approximately $1.65 million. She conceded that Allseas had paid $768,795.62 toward the SIT charges, so PSF was seeking the balance due of $880,257.19. Bray then testified that the total amount of FAT costs incurred were $210,924.71. Bray testified that Allseas had made no payments toward FAT, and therefore, PSF was seeking that entire amount.

Finally, Cecil Randall Porter, the owner of PSF, testified generally about project conditions that affected the amount billed for FAT and SIT costs. Porter testified that the testing costs on the Allseas project were higher than projected because Allseas caused lengthy delays during the project. Porter testified that PSF "ramped up" for the Allseas project—including hiring hard-to-find welders and engineers, preparing the yard to store equipment, and beginning to grade the yard for testing—and, then, when Allseas failed to deliver certain equipment it was required to provide under the contract, PSF was left in a holding pattern, incurring costs during the delay.

In its case-in-chief, Allseas presented the testimony of two expert witnesses whom Allseas engaged to analyze the documentation provided by PSF to justify its invoiced testing costs.[6] First, Allseas presented Michelle Delehanty, who worked in the construction and real estate advisory services division at Ernst and Young. Allseas presented Delehanty as an expert on cost-plus contracts. Allseas hired Ernst and Young after PSF filed suit to review the invoices and documentation provided by PSF and determine whether the documentation provided justified the amounts invoiced. Ernst

---

[6] PSF did not challenge either expert's qualifications.

and Young sent Delehanty to PSF's offices to perform the audit. Delehanty testified that she worked with Bray to obtain supporting documentation for the SIT and FAT labor and equipment costs invoiced by PSF. Delehanty was provided with Bray's spreadsheet that logged labor and equipment hours. With regard to the labor costs, Delehanty was provided with backup documentation, including daily job reports, which were hand-written logs of the hours employees worked on specified projects, and QuickBooks payroll records. Later in the litigation, Delehanty was also provided with time sheets that she also included in her analysis. Delehanty then compared the entries on the spreadsheet with the backup documentation and gave PSF credit for any labor costs that were justified by the documentation.

With regard to the equipment costs, Delehanty testified that she was never provided with backup documentation for costs documented in Bray's spreadsheets. To analyze the equipment costs logged by Bray in her spreadsheet, Delehanty testified that she used the daily job reports provided by Bray and work progress reports prepared by Moody International, a company Allseas hired to monitor the fabrication and testing work at PSF's yard. Delehanty compared the activities reflected in those reports with the equipment use logged in the spreadsheets to determine if the equipment was being used at the time indicated.

After completing her audit, Delehanty concluded that $977,912 of the approximately $1.9 million sought by PSF (SIT plus FAT costs) was questionable or unsupported by the backup documentation. This left approximately $882,000 as the amount of SIT and FAT appropriately documented by PSF.

Next, Allseas called Gregon Gant, a marine insurance loss adjuster, whom Allseas presented as an expert in cost-plus contracts for marine and offshore equipment. Gant reviewed, as supporting documentation for SIT and FAT costs, the Moody inspector's reports and reports by an inspector that Discovery kept onsite at PSF. Gant also reviewed drawings, cost estimates, procedure outlines, and change orders, all provided by Allseas, Discovery, and PSF. Using these documents, Gant arrived at what he believed were reasonable prices for PSF's testing work: $801,322.41 for SIT and $41,972.38 for FAT. Gant attributed the greater amount invoiced by PSF mainly to billing irregularities in PSF's labor cost calculations and excessive facility charges.

On cross-examination, both expert witnesses admitted that certain reports on which their analyses were based may not have given a complete picture of the work done by PSF. Specifically, Gant acknowledged that Discovery's site representative, whose reports he used as part of his analysis, was not at PSF's yard every day. Also, both experts acknowledged that the Moody inspector was not at PSF's yard every day. As a result, both experts conceded that their conclusions, based partly on these reports, could be faulty.

Finally, we note that the jury was presented with the following documentary evidence, available as exhibits admitted by both parties: the MSA; the ILS and PLES work orders, which included the labor and equipment rate sheets; PSF's invoices to Allseas; all of Bray's spreadsheets; the daily job reports used by both Delehanty and Gant; invoices from PSF's third-party vendors; computerized time records; and daily safety meeting checklists, including employees in attendance.

10

## 2. Analysis

The crux of Allseas's argument is that its expert testimony—showing that a majority of the testing costs invoiced by PSF were questionable or unsupported by the documentation provided by PSF—was never countered by PSF. Allseas argues that the jury's damages verdict exceeded the amount justified by the only credible evidence at trial and was therefore against the great weight and preponderance of the evidence. We disagree.

While we agree with Allseas that the testimony of Delehanty and Gant was strong evidence that PSF's documentation may have been imperfect, there was other evidence before the jury of PSF's attempts to document its invoiced testing charges. Allseas's primary complaint regarding the documentation was that Bray's spreadsheets, PSF's first attempt to document its charges, were inadequate because they were merely numbers typed into an Excel spreadsheet without any backup paperwork. But at trial, Bray explained that the numbers she typed into the spreadsheet, representing labor hours and equipment use, were based on daily job logs kept by supervisors in the yard and her own interviews with employees working in the yard. In addition to Bray's testimony, the jury had before it hundreds of pages of exhibits, including the contracts and labor and equipment rate sheets, all of Bray's spreadsheets, the daily job logs, computerized time records, invoices from third-party equipment vendors, and attendance information for daily safety meetings. Cecil Porter also testified about project conditions that potentially inflated the testing costs, namely delays by Allseas in providing equipment that forced PSF to incur excessive labor and preparation costs. Finally, the basis of both Delehanty

11

and Gant's expert opinions was called into question during cross-examination.

In short, there was ample evidence at trial in addition to Delehanty and Gant's testimony from which the jury could have calculated the damages award. As is its prerogative, the jury was free to disregard the expert testimony and, instead, give PSF credit for the testing costs it found to be adequately documented in the weighty volume of exhibits admitted at trial. *See McGalliard*, 722 S.W.2d at 697 ("It has long been the rule of this State that opinion testimony does not establish any material fact as a matter of law. Further, the judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone . . . ." (internal citations omitted)). In fact, we believe that the jury's damages verdict—which, at $403,509, was $686,491 less than the nearly $1.1 million PSF asked for—demonstrates that the jury engaged in a thoughtful and deliberate analysis of all of the evidence, likely including the expert testimony of Delehanty and Gant. Clearly, the jury bought neither party's argument wholesale, instead parsing through the available evidence and delivering a measured verdict. In other words, we disagree with Allseas's apparent contention that the jury must have entirely disregarded the expert testimony; if it had, its damages award would surely have been higher.

In the end, we are especially mindful of the principle that juries have considerable latitude in determining the amount of damages. *See id.* And having reviewed the entire record, we cannot conclude that the jury's damages award in this case was flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience, and as

such, we will not disturb it. *See Mo. Pac. R.R. Co.*, 25 S.W.3d at 257-58. We conclude that the jury's damages verdict was supported by factually sufficient evidence. *See Pope*, 711 S.W.2d at 624. Allseas's second issue is overruled.

## C. Pre-Payment of FAT Costs

By its first issue, Allseas argues that the jury's apparent conclusion that Allseas made no payment toward FAT costs was supported by factually insufficient evidence. At trial, PSF asked the jury for $210,924.19 as damages for unpaid FAT costs; the jury awarded $88,000 as FAT damages. Allseas argues that the testimony and accompanying documentary evidence at trial clearly shows that it pre-paid approximately $190,000 for FAT costs. For this reason, Allseas argues that the jury's $88,000 award was excessive.

Allseas points to a series of emails between its project manager, Douglas Gorman, and PSF's project manager during the last part of 2006, Douglas Gleason. In the emails, Gorman and Gleason agreed on an estimated budget for FAT that would be included in the milestone payments Allseas was making on the project.[7] According to the emails and Gorman and Gleason's testimony at trial, the estimated FAT budget for the ILSs would be $130,000, and the estimated FAT budget for the PLES would be $60,000. In the emails, the two men discussed that the estimated FAT budgets were "already being addressed" in the invoices for the ILSs and PLES.

Allseas next points us to a series of documents admitted as exhibits. First, the work order governing the PLES fabrication included a total price of $435,041. The fixed

---

[7] For both the ILS and PLES parts of the project, Allseas made payments in three thirty-percent installments and one final ten-percent installment.

13

price for the fabrication work listed on the work order was $375,041. The difference between the price for the fabrication work and the total price was $60,000. It is undisputed that Allseas paid all of the invoices for the PLES fabrication, totalling $435,041. Next, the work order governing the ILSs included a fixed price of $367,464 for the fabrication. Allseas then admitted PSF's first three milestone invoices for the ILSs, invoices of $148,789.20, representing ninety-percent of the ILS fabrication. The remaining ten percent, $49,569.40, led to a total of $495,964 invoiced for the ILS fabrication. The difference between the fixed price for the ILS fabrication work and the total price was approximately $130,000. It is undisputed that Allseas paid a total of $495,964 for the ILS fabrication.

Considering the emails and exhibits together, Allseas then argues that there was conclusive evidence that it already paid $190,000 toward FAT costs—i.e., the $60,000 excess represented in the total price on the PLES work order, and the $130,000 excess represented in the ILES milestone invoices. Allseas argues that this was evidence the jury could not have reasonably ignored.

Even assuming that the foregoing evidence conclusively proves that Allseas made payments of $190,000 in excess of the fixed fabrication costs, we disagree that the jury's verdict demonstrates that they ignored this evidence. At trial, when questioned by Allseas's counsel regarding the amounts invoiced in excess of the fixed costs, Bray testified that any excess would have been applied against outstanding SIT charges and denied that Allseas had made any payments toward FAT. In light of this testimony, we disagree with Allseas's threshold premise that the jury's verdict demonstrates an implied

14

finding that Allseas failed to pay the $190,000. Instead, it is entirely possible that the jury did as Bray suggested and credited the $190,000 toward outstanding SIT costs and then separately determined the amount of FAT it believed to be due to PSF. To alter the FAT damage award based on the record before us, as Allseas urges, would be to speculate as to the mental processes of the jury in composing its damages awards, something we decline to do here where, as previously discussed, the evidence supports both the FAT and SIT awards made. *See Ponce v. Sandoval*, 68 S.W.3d 799, 806 (Tex. App.—Amarillo 2001, no pet.) ("The mental processes by which a jury determines the amount of damages is ordinarily not cognizable by an appellate court.") (citing *Thomas v. Oldham*, 895 S.W.2d 352, 359-60 (Tex. 1995); *First Nat'l Bank v. Zimmerman*, 442 S.W.2d 674, 678 (Tex. 1969); *Prati v. New Prime, Inc.*, 949 S.W.2d 552, 555 (Tex. App.—Amarillo 1997, writ denied)).

In sum, having reviewed the entire record, we cannot conclude that the jury impliedly found that Allseas failed to make $190,000 in excess payments. And, as previously determined, we also cannot conclude that the evidence was factually insufficient to support the amount of FAT damages awarded by the jury. Allseas's first issue is overruled.[8]

## IV. Motion for New Trial

By its third issue, Allseas argues that the trial court erred in denying its motion for new trial based on newly discovered evidence. *See* TEX. R. CIV. P. 324. Allseas moved for a new trial based on the discovery of David Porter, a witness who Allseas alleges

---

[8] Having determined that the evidence was factually sufficient to support the amount of damages awarded by the jury, we decline to reach Allseas's remittitur request. *See* TEX. R. APP. P. 47.1.

15

came to light after trial and would have provided material testimony that would likely have changed the outcome of the trial.

> A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted.

*Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010) (citing *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983), *overruled in part on other grounds by Moritz v. Preiss*, 121 S.W.3d 715, 721 (Tex. 2003)).

The granting or denying of a motion for new trial is a matter within the sound discretion of the trial court, and we will not disturb the trial court's decision absent a manifest abuse of that discretion. *Jackson*, 660 S.W.2d at 809; *Cantu v. Butron*, 921 S.W.2d 344, 353 (Tex. App.—Corpus Christi 1996, writ denied). Specifically,

> "[t]he inquiry [is] not whether, upon the evidence in the record, it apparently might have been proper to grant the application in the particular case, but whether the refusal of it has involved the violation of a clear legal right or a manifest abuse of judicial discretion." *San Antonio Gas Co. v. Singleton*, 59 S.W. 920, 922 (Tex. Civ. App. 1900, writ ref'd). Every reasonable presumption will be made on review in favor of orders of the trial court refusing new trials. *Hartford Accident and Indemnity Co. v. Gladney*, 335 S.W.2d 792, 795 (Tex. Civ. App.—Waco 1960, writ ref'd n.r.e.).

*Jackson*, 660 S.W.2d at 809-10.

David Porter is the brother of PSF owner Cecil Porter. It is undisputed that David contacted the office of Allseas's counsel and left a message that he had information relevant to the case. The parties dispute the exact date that David made this contact. In an affidavit attached to Allseas's motion for new trial, counsel for Allseas averred that

16

the message was left with an associate in his office on Monday, August 2, 2010, the first day of trial. Allseas's counsel averred that he "was in trial all day August 2 through August 5, 2010, with the case going to the jury in the afternoon of August 5, 2010." He averred that he contacted David Porter "for the first time, via telephone . . . the evening [of] August 5, 2010." In the August 5 phone call, counsel "advised David Porter that the case was sent to the jury and there is nothing we can do at this time." Counsel averred that "[o]nce the jury returned its verdict," he "contacted David Porter a second time and thoroughly discussed the matter regarding the new evidence and had him sign an affidavit."

In its response to Allseas's motion for new trial, PSF included affidavits by Cecil Porter and Andre De Hart, a PSF employee, in which they recounted a conversation between Cecil and counsel for Allseas on the first day of trial. Both Cecil and De Hart averred that Allseas's counsel approached Cecil after the first day of trial and stated that counsel spoke with David over the weekend and "he sure doesn't like you a lot." Cecil then responded to counsel, "I don't like him a lot either" and "you better be careful, he is a dangerous man and will turn on you too."[9]

Evidence may be considered newly-discovered if discovered either after the conclusion of trial or so late in trial that it was impossible to present the evidence before trial closed. *See Cantu*, 921 S.W.2d at 353; *see also In re Thoma*, 873 S.W.2d 477, 512 (Tex. Rev. Panel 1994, no appeal) (citing *Jackson*, 660 S.W.2d at 809). Here, even

---

[9] Allseas argues in its brief that the affidavits of Cecil Porter and Andre De Hart are incompetent evidence as they were not properly sworn to and verified and relied entirely on hearsay. But having reviewed the appellate record before us, we find no objection to the trial court regarding the affidavits and, as such, will not address this argument for the first time on appeal. *See* TEX. R. APP. P. 33.1(a).

assuming that the first contact by David was made on Monday, August 2, 2010, as Allseas alleges—i.e., the first day of trial—we believe it was within the trial court's discretion in this case to determine that David Porter's testimony became available to Allseas early enough in trial that it was not impossible to present before trial closed.   In its brief, Allseas suggests that because of the frenzied nature of a jury trial, it was a practical impossibility for counsel to incorporate David Porter's evidence once trial started. Although we are sympathetic to the harried circumstances faced by counsel during trial, whether the evidence was discovered too late was a factual determination best made by the trial court.   And especially in light of the conflicting evidence regarding the timing of the discovery of David Porter, we will not disturb the trial court's determination in that regard.

Moreover, even if the evidence could be considered newly discovered, it would not have been an abuse of discretion for the trial court to determine that Allseas did not act with diligence in failing to immediately investigate the nature and strength of David Porter's testimony.   *See Waffle House*, 313 S.W.3d at 813.   With regard to its diligence, Allseas contends that David Porter's message was taken by an associate not involved with the trial and was not communicated to counsel trying the case until August 5, 2010. Allseas then suggests that because counsel was preoccupied with the on-going trial, counsel acted as soon as reasonably possible in waiting until the jury returned its verdict before investigating the potential evidence provided by David Porter.   Again, we believe that whether Allseas acted with sufficient diligence was a factual matter best left to the trial court's discretion.   Specifically, it would not have been unreasonable for the trial

18

court to conclude that the associate who took the message could have communicated it to counsel trying the case earlier than the last day of trial. *See In re O'Connor*, 92 S.W.3d 446, 449 (Tex. 2002) (orig. proceeding) (holding that an attorney's knowledge is imputed by law to every other attorney in the firm). And, regardless, there was evidence that counsel trying the case knew of David Porter as early as the first day of trial. The trial court could have reasonably concluded that counsel did not act diligently in failing to seek a continuance or otherwise attempting to incorporate David Porter's evidence before trying the entire case.

In short, we cannot conclude that it was a manifest abuse of discretion for the trial court to deny Allseas's motion for new trial. There was evidence both that David Porter was not newly-discovered and that Allseas did not act with diligence in investigating the evidence once it came to light. Allseas's third issue is overruled.

## V. Conclusion

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 28th
day of December, 2012.

19