Louis J. GRANO, Herbert Buchbinder, Pieter V. Cortelyou and Sam Raccioppi, Plaintiffs,

v.

The LONG ISLAND RAILROAD CO., Defendant.

No. 90 Civ. 2407 (RJW).

United States District Court, S.D. New York.

April 8, 1993.

Elkind Flynn & Maurer, P.C. by Ira M. Maurer, New York City, for plaintiffs.

Thomas M. Taranto by J. Dennis McGrath, Long Island R. Co., Jamaica, NY, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT J. WARD, District Judge.

These are the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed. R.Civ.P.

### FINDINGS OF FACT

I. *Stipulated Facts*

At all times relevant, Louis J. Grano ("Grano") was employed by defendant as a signal maintainer; Herbert Buchbinder ("Buchbinder") was employed by defendant as a signalman; Pieter V. Cortelyou ("Cortelyou") was employed by defendant as a signal maintainer; and Sam Raccioppi ("Raccioppi") was employed by defendant as a signal inspector.

The Long Island Railroad ("LIRR") is a public benefit corporation, organized and existing under the laws of the State of New York, which, at all times relevant, operated a railroad within the jurisdiction of this court.

In 1989, the LIRR Safety Department first distributed an informational pamphlet published by the Suffolk County Department of Health Services entitled "Lyme Disease" (Defendant's Exhibit B), and a poster containing a blowup of a Newsday article concerning Lyme Disease (Defendant's Exhibit C). These materials were distributed to employees of the LIRR Signal Department, among others.

II. *The Court's Findings of Fact: Liability*

During 1987, Grano was engaged in an electrification project at various work sites between Hicksville and Ronkonkoma in Suffolk County. For the most part, his duties involved the installation of new signal equipment which was placed in uncultivated areas along the railroad right of way.

In the spring and summer of 1987, his work clothes included jeans, boots and short-sleeved shirts. On many occasions, he observed ticks at the work sites. Grano observed ticks on himself approximately 25 to 100 times although he did not recall having been bitten on any occasion. He specifically remembered that once, in the vicinity of Central Islip, while working with plaintiff Raccioppi, numerous ticks were encountered.

Prior to beginning his work assignment in 1987, he received no instructions concerning ticks or the removal of growth in the areas where he would be working. Although the railroad sprayed defoliants along the roadbed, the spray only reached approximately 12 feet from track center. The signal equipment was located more than five feet further from track center. Grano was given no cutting or defoliation equipment.

At some point in the summer of 1987, Grano observed a rash on his right elbow and later experienced flu-like symptoms. In November 1987, he sought medical attention for these symptoms, as well as for aches and memory loss, which began during the summer. He went to Stony Brook Hospital, and

a blood test was administered, after which he received oral antibiotics. His symptoms became worse and included achiness, fevers, headaches, and memory problems. Grano was first diagnosed as having Lyme Disease at Stony Brook Hospital by Dr. Dattwyler. He developed emotional problems, for which he saw Dr. LaGrone. His condition interfered with his work and he was out sick for several weeks. During that time he started intravenous treatment beginning with one night in the hospital, and then two weeks at home.

In November 1987, he lost two to three weeks from work and in January 1988 he was out for a period which ended in the latter part of April or early May 1988. Later in 1988 he returned to the Stony Brook Hospital because he "didn't feel right."

In December 1989, he saw Dr. Burrascano, who advised him that he needed more intravenous treatment. After his second week of treatment he had a high fever and tingling in his skin, but after approximately seven weeks felt "really good."

He was away from work from January 1990 until late April or early May of that year, at which time he returned to work. Thereafter, he lost one or two days as a result of Herxheimer reaction, for which he was given oral antibiotics.

At the end of 1990 he saw Dr. Larry Weiss for emotional problems.

At the present time, his complaints include swelling of his knees, some aches and some memory loss. He finds that he now needs additional rest.

Grano's wife Denise noted an extreme change in his behavior in the summer of 1988 when he became "very emotional."

During the last 6 to 12 months, she observed that her husband's neck was swollen and he complained on occasion that his arm gets stiff.

The Court finds that Grano contracted Lyme Disease in the summer of 1987 while working on the LIRR electrification project.

In the summer of 1989, Buchbinder was working at the Babylon Tower when he was assigned to work on cable which had been

laid on the ground along the railroad right of way. The area was overgrown with weeds and bushes. Buchbinder was given a hand sickle and cut shrubbery to free up the cable which lay on the ground. During the course of his work he brushed numerous "bugs" off. He complained to his supervisor "we are getting scratched up."

In November 1989, he was diagnosed with Lyme Disease by Dr. Annis. About two months prior to that, he had began experiencing backaches, a burning sensation in his right arm, and numbness in his fingers and toes on the right side. In addition, he experienced pains in his knees and pains in his elbows.

He was put on antibiotics by Dr. Annis, and experienced a memory problem. He lost time from work between December 1989 and January 1990 and later in the year 1990. In all, Buchbinder lost approximately 100 days from work. In addition to Dr. Annis, Dr. Burrascano also treated Buchbinder for depression. Buchbinder continued to be treated by Dr. Burrascano during 1991 and up to May 1992. The doctor administered antibiotics and prescribed Prozac.

Buchbinder continues to have problems with his memory. He last lost time from work during 1991 when he lost approximately four to six weeks. Since that time, he has not lost any days from work. Despite the fact that Buchbinder never developed a rash and had no knowledge of being bitten by a tick, the Court finds that he has Lyme Disease which he contacted while performing his duties for the LIRR in the summer of 1989.

In the spring and summer of 1988, Cortelyou worked for the LIRR in Suffolk County, in areas where the vegetation included woody brush, grass and weeds, which grew waist high along the railroad right of way. During 1988, Cortelyou saw ticks on himself hundreds of times at numerous locations, although he has no recollection of ever having been bitten. In an effort to protect himself, he placed mats, pieces of plastic and old pieces of carpet on the ground so that he might avoid being bitten by the numerous insects which were present at the places where he was assigned to work.

He testified that prior to 1988, he received some instructions on protecting himself from tick bites and reviewed a brochure concerning dog ticks, which the Court takes to be a brochure similar to Defendant's Exhibit A. During the spring of 1988, he was working for the railroad in Suffolk County installing gate mechanisms. His job required that at times he work in a seated position in areas where there was high grass and weeds.

In the spring of 1988, he visited Dr. Greenblatt, complaining of stiffness and backaches. In September, 1988, he told Dr. Greenblatt that his right foot was asleep. The doctor sent him to the Stony Brook Hospital for a blood test. In May of 1988, Cortelyou had removed a tick from his hairline and a tick from his ear, which he reported to Andy Salvemini, an assistant foreman on the signal desk in Jamaica. The LIRR signal control desk log for May 13, 1988 contains a report of the incident followed by the entry "notified RAS". The initials are those of Roy A. Sharrow, signal supervisor.

In approximately September of 1988, Cortelyou received two weeks of antibiotic treatment, including Doxycycline. His right foot was numb and ached. He had stiffness in his leg, and back pain. Prior to September 1988, the LIRR did not provide Cortelyou with any equipment to cut high grass and weeds.

Beginning in November 1988, Cortelyou could not bend over without pain and lost time from work. In December 1988, he returned to work. He continued seeing doctors. By the end of 1989, he felt better. In 1990, he still had an ache in his right foot. This ache seems to have gone away. He has had no complaints in the last year and a half. The Court finds that Cortelyou, likewise contracted Lyme Disease while working for the LIRR and has now recovered. He lost approximately 30 days from work in the aggregate.

Raccioppi also worked on the LIRR electrification project with Grano. He was diagnosed with Lyme Disease in November 1987, after having worked mainly in the vicinity of Central Islip in areas of high grass and weeds and other vegetation. As noted above, Grano and Raccioppi worked together at a time when ticks were observed and were

removed from the persons of the employees working at the site.

Raccioppi did not receive any warning from the LIRR concerning Lyme Disease and its prevention prior to being diagnosed with the disease. The diagnosis followed a series of events beginning in the late summer of 1987, in which Raccioppi felt tired. His knees and elbows were swollen and he experienced Bell's palsy, a condition which continues to afflict him.

He received antibiotics orally, including Doxycycline, for approximately three weeks. Dr. Dattwyler administered a treatment which included an intravenous antibiotic. Treatment was administered in the hospital for one day and continued at home for approximately three weeks. Raccioppi had an initial reaction, including pain in his chest from the center out.

After three weeks on the antibiotics, he was very fatigued and experienced a swelling of his joints.

Raccioppi was away from work for approximately 130 days during 1987, 1988, 1989, 1990, and 1991. He still feels fatigued after a day's work. During the course of the trial, when he returned to work for one day, he experienced a recurrence of Bell's palsy. He suffers from anxiety and some residual memory loss. Raccioppi sees Dr. Paul Gelinas for these problems. His last visit to Dr. Gelinas was in December 1992, and he expects to see Dr. Gelinas again when the doctor returns from Florida, later this month. He has seen Dr. Gelinas some 142 times.

The Court finds that Sam Raccioppi contracted Lyme Disease in the summer of 1987 while working on the LIRR electrification project, although he too has no recollection of ever being bitten by a tick.

In addition to the four plaintiffs and the wives of plaintiffs Grano and Buchbinder, who corroborated their husbands' testimony, the Court heard from a number of railroads employees, including Roy Sharrow, presently principal engineer of signals. Sharrow, as well as the LIRR, was aware of tick problems beginning in 1986. The ticks were found in the underbrush, tall weeds, and tall grass, where signal equipment was located.

Sharrow was also aware that mats were being used by LIRR employees in an attempt to cover the ground to inhibit insects, including ticks. Although the LIRR sprayed the track right of way to kill vegetation between the rails and immediately adjacent to the tracks, the spraying did not extend beyond approximately 12 feet from track center.

The members of the signal department were frequently required to clear brush when working on the signal equipment, which was located beyond the spraying area. Sharrow was aware in May 1988, that Cortelyou had removed two ticks from his person. As noted above, there was no testimony from any of the plaintiffs that they were bitten by a tick.

In 1987 and 1988, during the electrification project, there were sections along the LIRR, where signal equipment was located, which were not sprayed. Spraying was done on a spot basis and no records were produced at trial with regard to the nature and extent of the spraying.

Robert Swayne Jr., the superintendent of track for the LIRR, described the method of spraying from high rail vehicles. As noted above, the spraying extended approximately 12 feet from track center. In addition, as noted above, there was manual spraying on a spot basis. The manual spraying was mainly to kill poison ivy and no particular attention was given to ticks.

Although Lyme Disease was discussed as a problem in 1987 or 1988, no comprehensive program was developed to protect employees working in tick infested areas.

Andrew Salvemini, the assistant foreman assigned to the signal control desk, indicated, among other things, that he had removed ticks from his person while in the field and, as far as he knew, no statistics were kept concerning tick bites. To his knowledge, he was never bitten by any tick, and just brushed them off.

John Bryan, a signal foreman, was aware of some occurrences in the form of tick bites during the LIRR electrification project in 1987 and 1988. There was no cutback program to prepare sites as installations were made. In 1987 or 1988, there had been tick bites reported by employees after which

sample specimens of the ticks were sent for medical testing.

The final fact witness was Dean Klimpel, safety officer for the engineering department. Klimpel testified that during the LIRR electrification project exposure to ticks was discussed at meetings. Employees were instructed to wear light colored clothing, wear high-top boots, and check for ticks, including the American brown dog tick.

He recalled that deer ticks were discussed at meetings sometime beginning about 1987 and continuing thereafter. On the subject of spraying, Klimpel testified that there had been spot applications on request since 1984; but there did not appear to be any other program for spraying, aside from the high rail spraying discussed earlier. Klimpel produced a pamphlet distributed in 1982 on the American brown dog tick; and also testified that the LIRR did not cut weeds and tall grass within approximately five yards of the signal equipment; and that the LIRR did not have a licensed contractor spray pesticides around the signal equipment.

Klimpel also produced a pamphlet, Defendant's Exhibit B previously referred to, and a poster, Defendant's Exhibit C previously referred to. He testified that high grass and high weeds could be controlled by manual spraying, but as noted above, there appears to have been no overall program for this type of spraying.

There was discussion between Klimpel and Swayne in 1988 or 1989 about spraying around signal equipment, and the LIRR began spraying around signal equipment in or about May 1989. As noted above, there were spot hand applications previously at certain locations. However, as has been noted, no records were produced at trial with regard to these hand applications.

The remaining testimony was derived from medical witnesses, including doctors Dattwyler, Burrascano and Gelinas. Drs. Dattwyler and Burrascano testified that in their opinion the four plaintiffs contracted Lyme Disease as the result of having been bitten by deer ticks while working at locations along the LIRR right of way in Suffolk County.

They testified that Lyme Disease is a condition which may or may not be cured and which may result in permanent disability. Dr. Burrascano, testifying with respect to Grano, indicated "I don't think he will completely come back to normal" and that Grano may require future treatment.

A similar prognosis was made by the doctors with respect to plaintiffs Buchbinder and Raccioppi. As noted above, plaintiff Cortelyou appears to have recovered.

The defense called Dr. Kevin M. Cahill, who testified concerning a heightened awareness of Lyme Disease from the early 1980's on. He testified that in his opinion it was impossible to be certain where Lyme Disease was acquired. He felt it was most likely acquired around homesites. In his opinion in an endemic area, unless you know where you have been bitten, you cannot tell with certainty where the Lyme Disease was acquired.

In a case such as this, the Court agrees that one cannot be certain, but the plaintiffs' burden is to prove that something is more probable than not. In Dr. Cahill's opinion, Grano might have Lyme Disease. As to Buchbinder, Dr. Cahill stated there was no evidence that he positively had Lyme Disease. As to Raccioppi, Dr. Cahill was unable to say whether he had Lyme Disease. And as to Cortelyou, in Dr. Cahill's opinion, he could have had Lyme Disease. The Court would note that Dr. Cahill, who did not examine any of the four plaintiffs, was unable to contradict the testimony of plaintiffs and their doctors that each of the plaintiffs had contracted Lyme Disease.

In sum, the Court finds that all four plaintiffs contracted Lyme Disease as the result of having been bitten by deer ticks while working for the LIRR at various sites in Suffolk County, between the summer of 1987 and 1989.

### CONCLUSIONS OF LAW

This is an action under Federal Employers' Liability Act ("FELA") 45 U.S.C. §§ 51–60. This Court has jurisdiction over the subject matter and likewise has personal jurisdiction over the parties.

■ The FELA requires an employer to provide its employees with a reasonably safe place to work, and this includes a duty to maintain and inspect work areas. The scope of this ongoing duty is clear: "An employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Gallose v. Long Island R.R.*, 878 F.2d 80, 84–85 (2d Cir.1989) (citing *De-Chico v. Metro–North Commuter R.R.*, 758 F.2d 856, 862 (2d Cir.1985); *Lindauer v. New York Central R.R.*, 408 F.2d 638, 640 (2d Cir.1969)).

■ While there is a considerably more relaxed standard of proof for determining negligence in FELA cases, *Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), and a strong federal policy in favor of letting the trier of the fact decide these cases, *O'Hara v. Long Island R.R.*, 665 F.2d 8, 9 (2d Cir.1981), the FELA does not make an employer strictly liable for workplace injuries, and therefore requires that employees must at least present some evidence that could support a finding of negligence. *Id.*

■ Plaintiffs are also required to prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation. *Robert v. Consolidated Rail Corp.*, 832 F.2d 3, 6 (1st Cir.1987).

■ The essential element of reasonable foreseeability in FELA actions requires proof of actual or constructive notice to the employer of the defective condition that caused the injury. *See Gallick v. Baltimore & O.R.R.*, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963). *See also Gallose v. Long Island R.R.*, 878 F.2d 80, 85 (2d Cir.1989) ("The catalyst which ignites [the duty to provide a safe workplace] is knowledge, either actual or constructive.").

■ In this case, the LIRR was negligent due to its failure to provide plaintiffs with a reasonably safe place to work.

The LIRR breached its duty to maintain and inspect work sites so that these areas might be reasonably safe for employees as-signed to work there. In the instant case, the railroad knew or should have known by the summer of 1987 of the tick infestations and of the risk of infection by what are commonly called deer ticks which transmit Lyme Disease.

The railroad had a duty to its employees to provide a safe place to work; it breached that duty by failing to provide a safe workplace; and it was foreseeable that the employees would be bitten by ticks and thereafter infected with Lyme Disease.

Plaintiffs established causation by a preponderance of the evidence, although not to a certainty. All four plaintiffs were assigned to work in tick infested areas, for the most part on eastern Long Island, and within weeks or months of working there, manifested symptoms of Lyme Disease. All were subsequently diagnosed as having Lyme Disease. The Lyme Disease contracted by all four plaintiffs was caused by their working in unsafe areas where they were doing their jobs, as they were required to do, in connection with their employment by defendant LIRR.

None of the plaintiffs claims an out-of-pocket loss, except for Buchbinder who sustained an out-of-pocket loss in the amount of $5,000. Each plaintiff has a claim for past and future pain and suffering, with the exception of Cortelyou, who appears to have recovered and whose claim is limited to past pain and suffering.

The Court makes the following awards to plaintiffs Grano, Buchbinder and Raccioppi for their past and future pain and suffering which was proximately caused by their having contracted Lyme Disease: Louis J. Grano, $225,000; Herbert Buchbinder, $140,000, plus $5,000 to compensate Buchbinder for his out-of-pocket expense; and Sam Raccioppi, $160,000. In addition, the Court awards Pieter V. Cortelyou $35,000 for past pain and suffering.

On April 5, 1993, the Clerk entered judgment in favor of plaintiff Louis J. Grano in the amount of $225,000; in favor of plaintiff Herbert Buchbinder in the aggregate amount of $145,000, which includes Buchbinder's out-of-pocket loss of $5,000; in favor of

the plaintiff Sam Raccioppi in the amount of $160,000; and in favor of plaintiff Pieter V. Cortelyou in the amount of $35,000, together with their costs in the action.