JUSTICE JOHNSON,
dissenting.
The Court concludes that under substantive federal law, which controls in this Federal Employers’ Liability Act (FELA) action, the ferae naturae doctrine was not part of the comparative negligence balancing entrusted to the jury, but rather that it completely negated Union Pacific’s duty to use reasonable care to provide a safe workplace. I respectfully dissent, .
I. FELA and Ferae Naturae A. FELA
. Congress enacted FELA in 1908 to address a perceived imbalance in the human costs borne by railroads and their employees. Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2896, 129 L.Ed.2d 427 (1994); see also Pub.L. No. 60-100, 35 Stat. 65 (1908) (codified as amended at 45 U.S.C. §§ 51-60). Section 51 provides
Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the- States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee’s parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.
Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect' such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.
45 U.S.C. § 51(emphasis added). As originally enacted, the Act specified that contributory negligence of the injured employee would not totally bar recovery, but “the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.” Id. § 53. However, assumption of the risk was a complete defense until the Act was amended in 1939 to provide that the doctrine would not bar recovery:
In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any ease where the violation by such common carrier of any statute enacted for the safety of employees *901 contributed to the injury or death of such employee.
Id. § 54 (emphasis added); see Urie v. Thompson, 337 U.S. 163, 188 n. 30, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).
Under the Act railroads have a duty to use reasonable care in providing a safe workplace for their employees. Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 558, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). While such a duty previously existed in common law, “Congress was dissatisfied with the common-law duty of the master to his servant” in the railroad context, and FELA “supplant[ed] that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer’s negligence.” Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 507, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Through the Act, Congress created new federal rights of recovery for injured railroad workers under a single framework. See Dice v. Akron, Canton, & Youngstown R.R. Co., 342 U.S. 359, 361, 72 S.Ct. 312, 96 L.Ed. 398 (1952).
Suits asserting FELA claims may be brought in either state or federal court. 45 U.S.C. § 56. But the necessity for consistent application of FELA throughout the country requires application of its provisions as substantive federal law, rather than allowing substantive law of a forum state to override the Act’s provisions. See Monessen Sw. Ry. Co. v. Morgan, 486 U.S. 330, 335, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988). To facilitate FELA’s remedial goals, the Act is liberally construed. Gottshall, 512 U.S. at 543, 114 S.Ct. 2396; see also, e.g., CSX Transp., Inc. v. McBride, 564 U.S. 685, 699, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011) (reaffirming the Rogers relaxed causation standard under FELA); Kernan v. Am. Dredging Co., 355 U.S. 426, 436-37, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (recognizing the application of negligence per se in FELA cases); Rogers, 352 U.S. at 506, 77 S.Ct. 443 (recognizing a relaxed causation standard under FELA); Urie, 337 U.S. at 180-81, 69 S.Ct. 1018 (recognizing occupational diseases as injuries under FELA). Because an employee’s rights under the Act are federal rights, the negligence cause of action it provides is not controlled by precedent of the forum state. Urie, 337 U.S. at 174, 69 S.Ct. 1018. Rather, it is based on federal standards developed through federal jurisprudence. Id.
Where the Act does not specifically address a matter necessary for the law to fulfill its purpose, or the federal jurisprudence is not developed as to the question, common-law principles inform the issue. But at bottom, what common-law principles apply and how they apply is a federal question:
[Section 51 of FELA] does not define negligence, leaving that question to be determined, as the Missouri Supreme Court said, “by the common law principles as established and applied in the federal courts.” Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), has no application. What constitutes negligence for the statute’s purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes. Federal decisional laiv formulating and applying the concept governs. Hence the Missouri Supreme Court’s decision on the first appeal, that the complaint did not state a cause of action for negligence, is subject to our independent review and is not to be taken as governed conclusively by the state court decisions which alone were cited in support of the determination. •
/¿(emphasis added). If under the foregoing construct it is necessary to consider *902 common-law principles to construe FELA, then it is not just the common law and its development in the forum state that is considered. Rather, it ⅛ the common law and its development across all states that is considered. See Gottshall, 512 U.S. 544-49.
In order to recover, FELA plaintiffs must prove the common-law elements of negligence—duty, breach, foreseeability, and causation. E.g., Van Gorder v. Grand Trunk W.R.R., Inc., 509 F.3d 266, 269 (6th Cir.2007); Tufariello v. Long Island R.R. Co., 458 F.3d 80, 87 (2d Cir.2006); Williams v. Nat’l R.R. Passenger Corp., 161 F.3d 1059, 1062 (7th Cir.1998); Stevens v. Bangor & Aroostook Ry. Co., 97 F.3d 594, 598 (1st Cir.1996); Brown v. CSX Transp., Inc., 18 F.3d 245, 249 (4th Cir.1994). But in McBride the Supreme Court clarified that reasonable foreseeability is the touchstone for measuring a railroad’s duty under FELA:
“[Reasonable foreseeability of harm,” we clarified in Gallick, is indeed “an essential ingredient of [FELA] negligence.” The jury, therefore, must be asked, initially: Did the carrier “fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]” In that regard, the jury may be told that “[the railroad’s] duties are measured by what is reasonably foreseeable under like circumstances.” Thus, “[i]f a person has no reasonable ground to anticipate that a particular condition ... would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition.” If negligence is proved, however, and is shown to have “played any part, even the slightest, in producing the injury,” then the carrier is answerable in damages even if “the extent of the [injury] or the manner in which it occurred” was not “[p]robable” or “foreseeable.”
564 U.S. at 703-04, 131 S.Ct. 2630(empha-sis and alteration in original) (citations omitted).
The Court says that I misread McBride and that in McBride “the Supreme Court was discussing not the extent of FELA liability but the limits on it.” Ante at 895 n. 13 (emphasis in original). But in discussing reasonable foreseeability, the Supreme Court said an employer’s statutory duty is measured by foreseeability. McBride, 564 U.S. at 703-04, 131 S.Ct. 2630. Thus, as is set out in the jury instruction approved in McBride, the employer’s duty is limited to, but also encompasses the duty to act reasonably to protect employees from such reasonably foreseeable risks as “would or might result in a mishap and injury.” See id. (emphasis added); id. at 717, 131 S.Ct. 2630 (Roberts, C.J., dissenting) (“The Court observes that juries may be instructed that a defendant’s negligence depends on ‘what a reasonably prudent person would anticipate or foresee as creating a potential for harm.’”). In other words, reasonable foreseeability that a risk would or might result in injury to a railroad’s employee marks the line between risks a railroad has the duty to take reasonable actions to protect its employees from and those it does not.
The question, then, is whether the common-law doctrine of ferae naturae is subsumed by the foreseeability aspect of the duty element of the statutory cause of action; that is, whether facts that would support application of the doctrine are to be weighed by the factfinder in determining whether an employer violated its duty to provide a safe workplace, or whether those facts yield a complete bar to recovery under FELA as a matter of law. In my view the Supreme Court has effectively *903 said that the doctrine is subsumed by the foreseeability aspect of the duty element in all but “far out” cases, if not. before, then certainly in McBride. McBride primarily addresses causation, but the Supreme Court’s clear language there as to the duty element of a FELA action cannot be disregarded. Even if its duty-element-directed language is, dictum, it is difficult to understand that language as anything less than judicial dictum—language the Court intended as guidance to the bench and bar. See Cerro Metal Prods. v. Marshall, 620 F.2d 964, 978 n. 39 (3d Cir.1980) (noting the distinction between judicial dictum and obiter dictum and the weight given to each); United States v. Bell, 524 F.2d 202, 206 (2d Cir.1975) (“ ‘[Judicial dictum’ [occurs] where the Court ... is providing a construction of a statute to guide the future conduct of inferior courts. While such dictum is not binding upon us, it must be given considerable weight and can not be ignored in the resolution of the dose question we have to decide.”); Elledge v. Friberg-Cooper Water Supply Corp., 240 S.W.3d 869, 870 (Tex.2007) (distinguishing judicial dictum and obiter dictum and holding judicial dictum must be followed); Palestine Contractors, Inc. v. Perkins, 386 S.W.2d 764, 773 (Tex.1964) (holding judicial dictum was deliberately made for the purpose of being followed by lower courts and should be followed unless found to be erroneous).
The existence and development of ferae naturae as a common-law no-duty "concept in Texas is a consideration in determining the doctrine’s status under FELA. But as is noted above, the common law of any particular state is not what controls how the doctrine fares under FELA. Rather, what controls is the purpose and intent of Congress when it enacted FELA, federal FELA precedent, and the historical context of the broad common law regarding ferae naturae at the time FELA was enacted. See Gottshall, 512 U.S. at 554-55, 114 S.Ct. 2396; Morgan, 486 U.S. at 337, 108 S.Ct. 1837. So, even if McBride’s language regarding a railroad’s negligence duty under FELA is obiter dictum, or even if I misread McBride as the Court maintains, the underlying considerations of the ferae naturae doctrine, the federal FELA cases addressing facts equating to the doctrine, and the historical status of the doctrine at the time Congress enacted FELA all compel the same conclusion, as is detailed below.
B. Ferae Naturae
The term “ferae naturae ” translates to “of a wild nature.” Black's Law DictionaRy 738 (10th ed.2014). When used in reference to animals, the phrase denotes animals that are wild by their nature and have not been domesticated. Id. The doctrine of ferae naturae has historically addressed property rights in, and liability for, such animals. Under the doctrine, possessors of such animals generally are strictly liable for harm they cause. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 22; Restatement (Second) of Torts §§ 507-08. But even if a landowner does not possess such an animal, if the landowner knows that one poses a danger" to persons on the land, then the landowner may be liable for harm the animal causes under a negligence theory. Restatement (Third) of Torts: Liab. for Phys-ioal & Emotional Harm § 22 cmt. e (“In such eases, the landowner, although not subject to strict liability, may be subject to negligence liability .... ”);. see also Restatement (Second) of Torts § 343.
Courts in Texas have' generally followed the Restatement approach regarding liability for harm caused by wild animals. E.g., Nicholson v. Smith, 986 S.W.2d 54, 61 (Tex.App.-San Antonio 1999, no writ); see also Overstreet v. Gibson Prod. Co. of Del *904 Rio, 558 S.W.2d 58, 61 (Tex.Civ.App.-San Antonio 1977, writ ref'd, n.r.e.) (“A possessor of land who holds it open to the public for entry for his business purposes is under a duty to exercise reasonable care to protect his business visitors from the acts of animals coming onto the premises. However ... he is under no duty to exercise such care until he knows or has reason to know that the dangerous acts by wild animals are occurring or about to occur.” (citation omitted)). Courts in several other states, including California, Florida, New Hampshire, and Virginia are in accord with that view. See Brunette v. Signore, 215 Cal.App.3d 122, 263 Cal.Rptr. 415 (1989); Palumbo v. State Game & Fresh Water Fish Comm’n, 487 So.2d 352 (Fla.Dist.Ct.App.1986); Belhumeur v. Zilm, 157 N.H. 233, 949 A.2d 162 (2008); Seaboard Air Line R.R. Co. v. Richmond-Petersburg Tpk. Auth., 202 Va. 1029, 121 S.E.2d 499 (1961). The general underlying reasoning is that wild animals are uncontrollable and unpredictable and are not property of the defendant for which the defendant is responsible.. As the Court sets out, the doctrine has been applied to insects.[1] Ante at 897; see Brunette, 263 Cal.Rptr. at 420; Belhumeur, 949 A.2d at 166; Nicholson, 986 S.W.2d at 63-64; Gowen v. Willenborg, 366 S.W.2d 695, 697 (Tex.Civ.App.-Houston [1st Dist.] 1963, writ ref'd n.r.e.).
Some states, however, have not adopted ferae naturae as a no-duty doctrine. See Booth v. State, 207 Ariz. 61, 83 P.3d 61, 65-66 (Ariz.Ct.App.2004) (holding the state’s duty to prevent elk lying in the highway was not eliminated by ferae naturae where the dangerous condition was foreseeable); CeBuzz, Inc. v. Sniderman, 171 Colo. 246, 466 P.2d 457, 460 (1970) (holding that a grocer had a duty under premises liability theory to protect customers from insects of a nature that are known to live on fruit); Copeland v. Lodge Enters., Inc., 4 P.3d 695, 700-01 (Okla.2000) (holding that an innkeeper’s duty to maintain a reasonably safe premises includes a duty to use effective pest control measures). Thus, under the broad common law—not simply Texas common law—there is not a current consensus about whether the ferae naturae doctrine eliminates any duty on the part of those who own or possess land to take reasonable action to warn persons on the land of, or protect them from, the risk of harm posed by wild animals or insects that might foreseeably come onto the land.
But regardless of the current status of the doctrine, in determining whether Congress intended a defensive theory not explicitly addressed by FELA to be viable in FELA actions, it is the common law as it existed at the time FELA was enacted that is the prime consideration. See Gottshall, 512 U.S. at 554-55, 114 S.Ct. 2396 (looking to 1908 common law to determine whether negligent infliction of emotional distress and the zone of danger test were accepted doctrines at the time, and only looking to current common law to confirm that the doctrines remained accepted); Morgan, 486 U.S. at 337-38, 108 S.Ct. 1837 (concluding that because award of prejudgment interest was not permitted at common law in 1908, the failure of Congress to explicitly address it did not make claims for prejudgment interest viable once its award became more widely accepted); United States v. Rabinowitz, 339 U.S. 56, 70, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting) (“Words must be read with the gloss of the experience of those who framed them.”); Taylor v. Fire *905 men’s & Policemen’s Civil Serv. Comm’n of City of Lubbock, 616 S.W.2d 187, 189 (Tex.1981) (“In the absence of a specific amendment, a statute should be given the meaning which it had when enacted.”).
At the time FELA was enacted in 1908, the ferae naturae doctrine was not a no-duty defense to negligence; that is, it did not operate to eliminate a landowner’s duty to those on the property. Instead it was an expression of property rights in unpossessed wild animals and of absolute or strict liability for possessed wild animals. See, e.g., Geer v. Connecticut, 161 U.S. 519, 522-28, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (tracing the history of property rights in wild animals from Roman law to present); Spring Co. v. Edgar, 99 U.S. 645, 651, 25 L.Ed. 487 (1878) (“[T]he rule is well settled, that whoever undertakes to keep such an animal {ferae naturae ] in places of public resort is or may be liable for the injuries inflicted by it on a party.”); Hays v. Miller, 150 Ala. 621, 43 So. 818, 819 (1907) (recognizing á distinction between liability for owners of domestic animals and that of those who possess animals ferae naturae in that the latter need not be negligent in order to incur liability for injury caused by the animal); May v. Burdett, 9 Q.B. 101, 110-11 (Eng.1846) (“[Wjhoever keeps an animal accustomed to attack and bite mankind, with knowledge that it is so accustomed, is prima facie liable [to] any person attacked ..., without any averment of negligence or default in the securing or taking care of it.... The precedents, both ancient and modern, with scarcely an exception, merely state the ferocity of the animal and the knowledge of the defendant, without any allegation of negligence or want of care.” (emphasis added)).
FELA expressly rejects certain common-law doctrines that are defensive in nature as to an employee’s negligence claim, but ferae naturae is not among them. See ante at 891; Norfolk S. Ry. Co. v. Sorrell, 549 U.S. 158, 168, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007) (“In Gottshall we ‘cataloged’ the ways in which FELA expressly departed from the common law: It abolished the fellow servant rule, rejected contributory negligence in favor of comparative negligence, prohibited employers from contracting around the Act, and abolished the assumption of risk defense.”). Where FELA does not expressly address a matter, common-law principles are “entitled to-great weight” in setting standards under FELA, although they are not determinative, Sorrell, 549 U.S. at 168, 127 S.Ct. 799, and as previously noted, the principles as they existed when FELA was enacted are of prime importance. See Gottshall, 512 U.S. at 554-55, 114 S.Ct. 2396; Morgan, 486 U.S. at 337-38, 108 S.Ct. 1837. In determining the weight to be given those principles, the' Supreme Court has consistently noted that the statute is to be construed liberally and in a “relaxed” manner so as to achieve Congress’s remedial purpose of redistributing much of the cost of on-the-job injuries from workers to employers. See Gottshall, 512 U.S. at 542-43, 114 S.Ct. 2396 (“Congress crafted a federal remedy that shifted part of the ‘human overhead’ of doing business from employees to their employers — We have liberally construed FELA to further Congress’ remedial goal.”).
Without specific reference to either the no-duty aspect of the ferae naturae doctrine or the duty element of the FELA cause of action, federal cases have turned on whether risks that in some jurisdictions might be encompassed by the doctrine are reasonably foreseeable. Gallick v. Balt. & Ohio R.R. Co., 372 U.S. 108, 117-18, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); see also McBride, 564 U.S. at 703, 131 S.Ct. 2630 (“The jury, therefore, must be asked, initially: Did the carrier ‘fai[l] to observe *906 that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances!?]’ In that regard, the jury may be told that ‘[the railroad’s] duties are measured by what is reasonably foreseeable under like circumstances.’ ” (citations omitted)). For example, in Gallick, an Ohio state jury found for a railroad employee who suffered extensive infection and disability from an insect bite. 372 U.S. at 109, 83 S.Ct. 659. The employee alleged the insect came from a stagnant pool of water on railroad property. Id. The railroad asserted that even if the bite occurred at work, the injury was “ ‘beyond the realm of reasonable probability or foreseeability, with the result that no duty arose’ to exercise due care to protect [the employee] ‘from any such risk.’ ” Id. at 110, 83 S.Ct. 659 (emphasis added) (quoting Gallick v. Balt. & Ohio R.R. Co., 173 N.E.2d 382, 384 (Ohio Ct.App.1961)). The Ohio state trial court rendered judgment for the employee. Id. at 112, 83 S.Ct. 659. The court of appeals reversed and rendered for the railroad on the basis that there was no evidence the insect came from a pooh on the railroad’s property,, as opposed to from a nearby river or weeds on property not owned by the railroad. Id. at 112-13, 83 S.Ct. 659. The Ohio Supreme Court declined review of the case. Id. at 109, 83 S.Ct. 659. The United States Supreme Court reversed and reinstated the trial court judgment, holding there was sufficient evidence to sustain the jury’s finding that the insect bite was a foreseeable risk and causally related to a breach of duty by the railroad. Id.
Though neither the briefs in Gallick nor the Court’s opinion explicitly used the term “ferae naturae,” the railroad argued, in part, the essence of the ferae naturae no-duty doctrine: even if the injuries were the result of a bite Gallick suffered in the course of his employment, the railroad had no duty to protect against such an unforeseeable incident. Brief of Respondent at 30-31, Gallick, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618; see also Gallick, 173 N.E.2d at 384 (stating that the railroad, “denying any negligence on its part, said that, if the condition of Mr. Gallick arose from an insect bite sustained by him while working upon railroad property, ‘the likelihood of harm and consequences’ to Mr. Gallick from such bite ‘were beyond the realm of reasonable probability .or foreseeability, with the result that no duty arose requiring the exercise of care by the railroad ‘to protect’ Mr. Gallick ‘from any such risk.’ ”). Further, the railroad argued—as it had in the state courts—that there was no evidence the insect came from or was attracted by a condition on the railroad’s premises, thus the finding that it came from the railroad’s property was based on speculation. Brief of Respondent at 32, Gallick, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618. According to the railroad, that lack of evidence was highlighted by the fact that the site where the employee suffered the bite was within 75 yards of a separate, “sewage-laden” river in the heart of an industrial area that was “neither clean, sanitary, nor beautiful,” and which could have been where the insect came from. Id. at 5. The Supreme Court disagreed. It determined that the jury could have inferred from the evidence that the insect was from, or attracted by, the stagnant pool, and that such an inference was sufficiently supported under FELA standards:
The Court of Appeals erred in demanding either “direct evidence that the existence of the unidentified bug at the time and place had any connection with the stagnant and infested pool” or else more substantial circumstantial evidence than that adduced here “that the pool created conditions and influences which helped *907 to incubate or furnish an environment for the bug ... or that the insect, having traveled from other areas, became contaminated or infected by the pool.” Under the ruling cases in this Court the evidence present was sufficient to raise an issue for the jury’s determination as to whether the insect emanated from the pool.
Gallick, 372 U.S. at 114, 83 S.Ct. 659(cita-tion omitted). By affirming the trial court’s judgment on the jury verdict;the Supreme Court necessarily rejected the railroad’s argument that it had no duty to Gallick regarding the possibility of injury from the insect despite the fact that it was undisputed the railroad was unaware of its presence.
In Pehowic v. Erie Lackawanna Railroad Co., 430 F.2d 697 (3d Cir.1970), the Third Circuit considered a case in which a railroad employee was attacked by bees while working. Though the appeals court did not refer to ferae naturae by name in its opinion, the railroad raised issues mirroring those underlying the doctrine, such as the speculative nature of. whether any particular injury-causing insect came from the railroad’s property as opposed to surrounding property, and the lack of anyone’s realistic ability to control flying insects. Id. at 700 n. 6. The railroad argued that it could not be charged with controlling the movement of bees because they are “creatures of nature” and could have come from neighboring properties. Id. The trial court dismissed the case, but the appeals court reversed. Id. at 698. Focusing on the plaintiffs testimony that bees were in the area of brush on the track, that he informed the railroad of their presence, and that the railroad failed to mitigate the hazardous conditions, the court held that there was evidence creating a fact question for the jury as to both duty—whether the railroad knew or should have known of the hazard—and causation, including foreseeability. Id. at 700 (“It is not unreasonable to conclude that some injuries from these conditions ... were foreseeable by the employer. From the facts presented, the jury could reasonably conclude that the defendant’s omission to mitigate these conditions was a breach of its duty to provide its employees with a reasonably safe place to work.” (citations omitted)).
i. In Grano v. Long Island Railroad Co., 818 F.Supp. 613 (S.D.N.Y.1993), the plaintiff railroad workers contracted Lyme disease from tick bites they received while working in and around brush on the railroad’s right-of-way. Although the railroad had sprayed some of the vegetation where the employees worked, the spraying was limited in area and was meant to control vegetation, not ticks. Id. at 616-17. The court held that the railroad breached its duty to exercise reasonable care to inspect and maintain safe work sites for its employees when it knew or should have known of infestations of ticks that transmit Lyme disease. Id. at 618.
The only state court to consider whether ferae naturae applies as a no-duty doctrine under FELA held that it did not, because under Nebraska law foreseeability of harm from mosquito bites was an issue related to breach of the railroad’s FELA duty to provide a reasonably safe place to .work. See Deviney v. Union Pac. R.R. Co., 280 Neb. 450, 786 N.W.2d 902, 907 (2010). In that case Vivika Deviney, a conductor for the railroad, alleged she contracted West Nile virus from mosquito bites she suffered while inspecting the exterior of a train. Id. at 905. She asserted that the railroad was negligent in not warning her of the dangers of mosquitoes and not treating standing water on and near railroad property. Id. There was evidence that the railroad had published a document *908 warning of the danger of West Nile virus and describing precautionary measures, but that the plaintiff was not aware of the document. Id. at 908. There was additional evidence of standing water on railroad property where mosquitoes could hatch. Id.. The trial court granted summary judgment for the railroad, but the appeals court reversed. Deviney v. Union Pac. R.R. Co., 18 Neb.App. 134, 776 N.W.2d 21, 29 (2009), aff'd, 280 Neb. 450, 786 N.W.2d 902 (2010). The appeals court did not address ferae naturae by name, but a dissenting justice opined that the railroad did not owe its employee a duty under- FELA either to warn her of the danger or to protect her from mosquitoes carrying West Nile virus where the mosquitoes were in their natural habitat. See id. at 29 (Cassel, J., dissenting).
In affirming the judgment for Deviney, the Nebraska Supreme Court noted the railroad’s assertion that the feme naturae doctrine should apply and negate any duty it owed Deviney. Deviney, 786 N.W.2d at 907. But the Court opined that “under FELA, an employer has a duty to provide a reasonably safe place to work. Under [a prior decision of this Court], foreseeability is an issue of fact that relates to a breach of that duty, to be determined by the fact finder.” Id. The court concluded that evidence of the railroad’s failure to warn and failure to address standing water on railroad property presented an issue of material fact about ' whether the railroad breached its duty to provide a reasonably safe workplace. Id. at 908-09.
C. Analysis
Like the defendants in Gallick, Pehowic, and Deviney, Union Pacific argues that it cannot be charged with a duty to control actions of uncontrollable, unpredictable, wild insects. It maintains that its duty to use reasonable care to provide a safe place to work did not require it to warn or instruct Nami about the extent of the risks of infection posed by mosquitoes or to make mosquito spray available to him, which were the actions the jury was charged to consider in finding whether Union Pacific was negligent.[2] But even apart from the specific language in McBride, the cases referenced above yield the conclusion that federal courts do not construe FELA to incorporate the no-duty aspect of ferae naturae and thereby withhold the question from the jury and negate, as a matter of law, a railroad’s statutory duty to provide a reasonably safe workplace. Neither the doctrine itself nor its substance thus far has been used by federal courts to wholly negate a railroad’s duty to its employees. See McBride, 564 U.S. at 704, 131 S.Ct. 2630 (“Properly instructed on negligence and causation, and told, as is standard practice in FELA cases, to use their ‘common sense’ in reviewing the evidence, juries would have no warrant to award damages in far out ‘but for’ scenarios. Indeed, judges would have no warrant to submit such cases to the jury.” (citations omitted)). In my view, federal courts would not do so in this case *909 in light of the doctrine’s history and development vis-á-vis "FELA’s enactment because the evidence in this case does not make it one that is so “far out” that the case should not have been submitted to the jury. See id.
The railroad knew of the dangers of West .Nile virus and how it was spread. Union Pacific did not attempt to control the mosquitoes on the track and right-of-way where it sent Nami and his crew to work each day. As the Court notes, any such attempts would have been doomed to failure, anyway. However the railroad knew that large, uncontrollable numbers of mosquitoes would be on its right-of-way regardless of where they bred, and that mosquitoes spread West Nile virus: it put out warnings regularly for several years, with the last being just a few months before Nami was infected. The Court says that Nami’s theories of liability shifted somewhat during the litigation, but the question he asked the jury and which is before us is not subject to shifting and is not whether the railroad was negligent for failing to control the mosquitoes or prevent the risk ,of infection from them. Nami asked the jury whether Union Pacific was negligent in the “manner or extent it provided to [Nami] warnings/instructions about mosquitos or made available to [him] mosquito spray” in light of what it knew or should , have known about the overwhelming number of mosquitoes and the risk of West Nile virus infection posed by them. The railroad-did not and does not challenge the wording of the jury charge. Because the measure of an FELA employer’s duty to provide a safe workplace is reasonable foreseeability that “a particular condition ... would or might result in a mishap and injury,” id. at 703, 131 S.Ct. 2630 (emphasis added), the question was properly submitted to the jury under FELA standards.
The Court says the risk of Nami being infected with West Nile virus was so minuscule as to negate its foreseeability by Union Pacific as a matter of law. Ante at 899. That is another way of saying that under the standards expressed in McBride the risk was so “far out” that the jury should not have been allowed to determine whether the railroad breached its duty to Nami. See McBride, 564 U.S. at 704, 131 S.Ct. 2630. In discounting the risk that Nami or other workers could have been infected, the Court points to epidemiological evidence that ohly one person—not Nami—was reported to have been diagnosed with West Nile virus in Brazoria County in 2008, and only eleven people were diagnosed with the virus in counties surrounding Brazoria County. The Court takes notice of Brazoria County’s population at the time (301,228) and asserts that a person was more likely to have drowned, choked to death, or died in an accidental fire than to have contracted the disease. The Court’s logic is faulty in three ways.
First, the railroad’s actions in issuing bulletins warning of West Nile virus demonstrate that the risk its employees might be infected by mosquitoes was foreseeable to the railroad and that it knew the consequences of infection were potentially devastating. Its warnings also indicate that West Nile virus was not just another one of the risks inherent in normal activities of life to which all persons are subject, especially in light of its sending Nami and his co-workers out of their home county to another, where the number of mosquitoes was overwhelming, and infected mosquito pools had been discovered.
Second, the Court discounts the uncon-troverted evidence that approximately eighty percent of persons infected with the virus remain asymptomatic; another twenty percent develop only “flu-like” symptoms of fever, headaches, vomiting, and *910 rashes; and fewer than one percent have serious, debilitating symptoms and effects such as Nami developed. The Court’s position does not fairly credit the record. Nami was ill for approximately three weeks beginning around the end of September before his infection was diagnosed as West Nile virus. For that entire time he believed he had the flu and expected to get better any day. Only when his daughter found him incoherent at his home and took him to the hospital on the evening of October 22 was he tested for the disease. Even then, Nami’s physician did not consider West Nile virus as a possibility until Nami’s wife mentioned Nami had • been working west of Houston. The most reasonable inference from the evidence, and certainly one the jury could have drawn, is that with two cases of, infection traced to Brazoria County—Nami’s[3] and one other—-there likely would have been close to two hundred or more instances of human infection in Brazoria County. Under the evidence the Court references, approximately eighty percent of those cases would have been asymptomatic and the remainder would have had “flu-like” symptoms unlikely to be diagnosed as West Nile virus; but all of the infected persons were at risk of the devastating type of problems Nami suffered. Only fortuity or some unknown factor prevented severe symptoms and physical problems in the more than ninety-nine percent of infected persons who did not develop severe, disabling problems.
Third, the evidence indicated that though Nami likely contracted the disease in Brazoria County, his infection was apparently reported in statistics for DeWitt County where he lived and was diagnosed. Thus, another reasonable inference the jury could have drawn was that there were additional cases in which persons contracted the . disease in Brazoria County, later became symptomatic, and were diagnosed in a county other than Brazoria. That inference could have led the jury to conclude that there likely were many more humans infected with West Nile virus in Brazoria County than the two hundred or so cases that the two cases—including Nami’s—actually diagnosed as arising there would indicate. The Court impliedly speculates that none of the eleven cases diagnosed in counties surrounding Brazo-ria County involved persons infected in Brazoria County but diagnosed in their home county, as the jury apparently concluded happened with Nami. But for all this record shows, one, some, or all of those eleven cases could have been persons infected in Brazoria County and diagnosed elsewhere. And for each person that was infected in Brazoria County, there would have been a hundred or more persons infected there who went undiagnosed.
The Court says that “[tjhere is no evidence that [Union Pacific] could have reduced the risk” of contracting West Nile virus. Ante at 899. However, there is. Dr. Krista Murray, a veterinarian and epidemiologist at Baylor College of Medicine’s National School of Tropical Medicine, was called by Nami as an expert. She testified without contradiction that wearing long-sleeved shirts and using DEET-based mosquito spray reduces the risk óf contracting West Nile virus. There is' also testimony that had Nami been made aware of the risk and the actions that would reduce it, he would have taken those actions.
The Court asserts that “[t]here is no evidence that Union Pacific could have done anything to prevent mosquitoes throughout the area from being around its *911 siding and tracks.” ■ Ante at 899. I agree. But the issue submitted to the jury was not whether Union Pacific could have done something to prevent mosquitoes where Nami and his crew worked. Rather, the issue submitted and which the jury answered affirmatively was whether the railroad was negligent in failing to warn or instruct Nami about the risk mosquitoes posed, or to provide mosquito repellent. Ante at 895. The jury did not find the railroad negligent for failing to prevent mosquitoes from being around its tracks, so the Court’s assertion is irrelevant as this case is presented.
The Court further says that “West Nile virus was well-known to the public” and that Union Pacific “warned its employees to protect themselves” and “discussed [that warning] at safety meetings Nami was required to attend.” Ante at 898. But there was testimony that West Nile virus was not well-known to the public in south Texas at the time. Further, Nami testified without dispute or contradiction that he did not know about it. He testified that because of conflicting work assignments he occasionally missed the railroad’s monthly safety meetings, and the railroad presented no evidence to contradict his testimony that the virus was not discussed at any of the meetings he attended. Further, while Union Pacific knew about the .virus and issued bulletins warning of it, there is no evidence that any of the bulletins were provided to Nami—directly, indirectly in his work crew’s policy notebook, or otherwise.
I would hold that under the facts of this case the common-law doctrine of ferae na-turae did not negate Union Pacific’s duty under FELA to act reasonably to provide Nami a safe place to work and it was proper to submit the case to the jury.
II. Sufficiency of the Evidence
Because I would hold that Union Pacific’s duty to act reasonably to provide Nami a safe place to work was not negated by the ferae naturae doctrine, I would also address the railroad’s argument that there is no evidence Nami probably contracted the virus while he was at work in Brazoria County.
A. Standard of Review
Sufficiency of the evidence to support jury findings in FELA cases is determined by federal law. Tex. & Pac. Ry. Co. v. Roberts, 481 S.W.2d 798, 800 (Tex.1972). The standard of review for legal sufficiency in FELA cases is whether reasonable minds could differ on the question posed. See Rogers, 352 U.S. at 510, 77 S.Ct. 443 (“Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee’s' injury.”). Stated differently, the standard is whether there is more than a scintilla of evidence in support of the fact. W. & Atl. R.R. v. Hughes, 278 U.S. 496, 497-98, 49 S.Ct. 231, 73 L.Ed. 473 (1929); see also Sinkler v. Mo. Pac. R.R. Co., 356 U.S. 326, 332, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958) (Harlan, J., dissenting) (noting that in Rogers, 352 U.S. at 524, 77 S.Ct. 443, “the Court in effect established a ‘scintilla’ rule in these cases for judging the sufficiency of the evidence on the issue of ‘causation.’”); Rivera v. Union Pac. R.R. Co., 378 F.3d 502, 507 (5th Cir.2004) (describing the evidentiary burden for causation under FELA as “featherweight”). At the same time, the evidentiary standard under the broad causation language in FELA is both different from and “relaxed” compared to that applicable in common-law tort litigation. McBride, 564 U.S. at *912 691-92, 131 S.Ct. 2630. As the Court explained in McBride:
Tellingly, in announcing the “any part ... in producing the injury” test, Rogers cited Coray v. Southern Pacific Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208 (1949), a decision emphasizing that FELA had parted from traditional common-law formulations of causation. What qualified as a “proximate” or legally sufficient cause in FELA cases, Coray had explained, was determined by the statutory phrase “resulting in whole or in part,” which Congress “selected ... to fix liability” in language that was “simple and direct.” Id. at 524, 69 S.Ct. 275. That straightforward phrase, Co-ray observed, was incompatible with “dialectical subtleties” that common-law courts employed to determine whether a particular cause was sufficiently “substantial” to constitute a proximate cause.
Id. at 696, 131 S.Ct. 2630(alterations in original). The Court continued, “[wjhile some courts have said that Rogers eliminated the concept of proximate cause in FELA cases, we think it ‘more accurate ... to recognize that Rogers describes the test for proximate causation applicable in FELA suits.’ ” Id. at 700, 131 S.Ct. 2630 (quoting Sorrell, 549 U.S. at 178, 127 S.Ct. 799).
In Gallick, the Supreme Court addressed the level of evidence required to satisfy the FELA standard in a case involving an insect bite. 372 U.S. at 112, 83 S.Ct. 659; see also McBride, 564 U.S. at 703, 131 S.Ct. 2630 (referencing Gallick to demonstrate the level of evidence required to satisfy the FELA standard). As the Supreme Court put it, the appeals court reversed on the basis that there was no evidence the stagnant pool and insect were related, thus there was no evidence of causation:
The court [of appeals] emphasized, however, that there was no “direct evidence that the existence of the unidentified bug at the time and place had any connection with the stagnant and infested pool,” or had become infected by the pool with the substance that caused petitioner’s infection, evidence which would negative the alternative possibility that the insect had emanated from “the nearby putrid mouth of the Cuyahoga River, or from weeds, or unsanitary places situated on property not owned or controlled by the railroad.” The Court of Appeals therefore deemed the evidence merely “a series of guesses and speculations ... a chain of causation too tenuous ... to support a conclusion of liability.” “(W)e have a chain of possibilities that the negligence of the defendant might have shared in subjecting the plaintiff to damage and injury, but the proof of a legal causal connection between the negligence and the damage falls short of that required for the consideration of a jury.” Accordingly, it reversed the judgment of the Court of Common Pleas and entered final judgment for respondent.
Id. at 112-13, 83 S.Ct. 659(citations omitted). The Supreme Court reversed:
We think that the Court of Appeals improperly invaded the function and province of the jury in this Federal Employers’ Liability Act case. According to the Court of Appeals, the break in the causal chain that turned it into a mere “series of guesses and speculations” was the want of evidence from which the jury could properly conclude that respondent’s fetid pool had had something to do with the insect that bit petitioner. The only question was whether or not the insect was from or had been attracted by the pool. We hold that the record shows sufficient evidence to warrant the jury’s conclusion that petitioner’s inju *913 ries were caused by the acts or omissions of respondent.
Id. at 113, 83 S.Ct. 659.
B. Analysis
Union Pacific argues that the Culex mosquito, which is known to transmit West Nile virus, bites at dawn and dusk, and since Nami worked in Brazoria County in the middle of the day there was no evidence he was infected at work even if the railroad was negligent in failing to warn or instruct Nami about mosquitoes or to provide mosquito repellent. Union Pacific argues that testimony of Nami’s expert, Dr. Murray, reveals a risk of contractipg West Nile virus only at dawn and dusk. The railroad’s characterization is incorrect. Dr. Murray stressed that Culex mosquitoes are most active at dawn and dusk. But she also testified that they would probably stir from their resting places if and whenever they were disturbed. She related a reported case in which golfers were infected with West Nile virus by mosquito bites in the mid-morning.
Union Pacific also argues that Dr. Murray’s testimony that Culex mosquitoes could bite if disturbed from their resting place in the middle of the day was stricken by the trial court; the evidence should not have been relied upon by the court of appeals; and without such evidence a reasonable juror could not have concluded that Nami was infected in the midday hours that he worked in Brazoria County. However, even though the trial court sustained one objection to an answer by Dr. Murray regarding midday mosquito activity, the court specifically limited the ruling to that response. It ruled that “the rest of the answers [the jury] can rely on.” The rest of Dr. Murray’s testimony, including testimony that a Culex mosquito would move about and probably leave its resting place if disturbed and that golfers were infected from bites during daytime hours, was properly before the jury. Further, Nami testified without contradiction that he spent his time at work both outdoors and in the unsealed cab of his tamper; mosquitoes were abundant both inside and outside the cab of the tamper; Nami and his crewmates would disturb mosquitoes by their activities; when the mosquitoes were disturbed, they would bite the workers; and mosquitoes bit him at all times during the day while he was working.
As discussed above, the Supreme Court has mandated that a particularized, “relaxed” causation standard applies in FELA cases, as opposed to common-law notions of proximate cause. The railroad does not dispute that Nami was infected by means of a mosquito bite. Nami testified that mosquitoes bit him regularly while he worked in Brazoria County during the time when the evidence showed that he would have become infected, evidence showed that there were multiple pools of mosquitoes in Brazoria County that tested positive for West Nile Virus, and there was no evidence of mosquitoes carrying the virus in DeWitt County.
In my view, the evidence was legally sufficient under the “relaxed” FELA standard to show that Nami was infected with the West Nile virus while working for the railroad in Brazoria County.
III. Conclusion
I would affirm the judgment of the court of appeals, although for different reasons from those the court of appeals expressed.

. Some referenced cases involve creatures such as ants, ticks, and spiders as well as mosquitoes. For the sake of brevity and clarity I will use "insect” to refer to bugs that creep, crawl, slither, fly, or do all four.

. The jury was instructed that in order to find the railroad was negligent in "legally causing” Nami’s injuries,
[Y]ou must find that William R. Nami contracted West Nile virus while in the course and scope of his employment for Union Pacific Railroad Company, that Union Pacific Railroad Company was negligent in the manner or extent it provided to William R. Nami wamings/instructions about mos-quitos or made available to William R. Nami mosquito spray, and that said negligence was a cause, in whole or in part, of William R. Nami contracting West Nile virus,
(emphasis added). The jury found that the negligence of both the railroad and Nami caused "the occurrence in question” and apportioned fault 80% to Union Pacific and 20% to Nami.

. See discussion of Union Pacific’s challenge to the sufficiency of the evidence to support a finding that Nami was infected in Brazoria County, infra.